**Dovie FREEMAN, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

No. 81–1354.

United States Court of Appeals, Fifth Circuit.

May 2, 1983.

---

Jeremiah Handy, Asst. U.S. Atty., San Antonio, Tex., Jeffrey Axelrad, Mary L. McElroy, Dept. of Justice, Washington, D.C., for defendant-appellant.

David R. Richards, Austin, Tex., John E. Collins, Irving, Tex., for plaintiff-appellee.

Before THORNBERRY, REAVLEY and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

The United States appeals from a judgment rendered against it under the Swine Flu Act, 42 U.S.C. former §§ 247b(j)–247b(*l*), the legislative enactment which established the National Swine Flu Immunization Program in 1976. Following a nonjury trial, the district court found that the United States had breached its duty to warn plaintiff, Dovie Freeman, of the risks of the swine flu vaccine and that such breach both in fact and proximately caused Ms. Freeman to develop adhesive capsulitis in her right shoulder. Because we find that the district court applied an erroneous standard of care and, moreover, that the condition which Ms. Freeman developed was an unknown side effect of the vaccine at the time of her injection, we reverse.

### FACTS

On November 10, 1976, Dovie Freeman, an Austin, Texas, resident, went to the Rosewood Neighborhood Center in Austin to receive a swine flu vaccination. Ms. Freeman had been encouraged to take the shot by television advertisements and by her two daughters-in-law, both of whom were pregnant and were afraid that Ms. Freeman's occupation as a waitress would readily expose her to the virus. According to Ms. Freeman, when she arrived at the Rosewood Neighborhood Center around noon there were eight or ten people waiting to receive the inoculation. After waiting approximately ten minutes, she received the shot in her right arm. The record indicates that before Ms. Freeman received the swine flu injection she signed a document which stated that she had received monovalent swine influenza vaccine (A/New Jersey) and provided the following "instructions":

"As a result of the flu immunization, this person may have a mild fever within the next forty-eight hours, as well as minor aches and pains.

"Children under twelve years of age can receive temporary relief from these symptoms by taking *acetaminophen.* See your physician or druggist if you do not already have this preparation. Follow their instructions, or those on the package, for dosage to be given.

"For persons twelve years of age or over who are not allergic to aspirin, these symptoms can be relieved by taking two five-grain (adult) *aspirins* every 4–6 hours.

"If you cannot take aspirin, use other analgesics prescribed by your physician. If temperature rises above 101° F, or if pain or discomfort is severe or persists more than two days, consult your physician or local health department for further advice and treatment." (Emphasis in original.) [1]

After the injection had been administered, she was given a slip of paper with the title "Important Information About Flu Vaccines From the U.S. Public Health Service" which stated:

"While there is no reason to expect more serious reactions to this flu vaccination, persons who believe that they have been injured by this vaccination may have a claim. The Congress recently passed a law providing that such claims, with certain exceptions, may be filed only against the United States Government. Information regarding the filing of claims may be obtained by writing the U.S. Public Health Service Claims Office . . . . "

During the ten to fifteen minutes that she was at the Rosewood Neighborhood Center Ms. Freeman did not speak to anyone about the nature of the swine flu vaccine or its potential adverse consequences.

Approximately thirty-six hours after receiving the vaccine Ms. Freeman began to experience extreme pain in her right shoulder and arm, the arm in which the vaccine was administered. Her condition was diagnosed as adhesive capsulitis of the right shoulder, an inflammation of the protective

sheath that surrounds the joint. The pain restricted the mobility of Ms. Freeman's right arm, which inhibited her ability to perform her duties as a waitress. It also prevented her from sleeping comfortably. According to Ms. Freeman, the pain in her right arm and shoulder continued, in gradually diminishing degrees of severity, through the time of trial in May 1981. In response to her condition Ms. Freeman sought assistance from several physicians, a chiropractor and physical therapist; yet, none of the prescribed treatments was able to eliminate her pain.

On November 17, 1978, Ms. Freeman filed this action against the United States pursuant to the provisions of the Swine Flu Act, 42 U.S.C. §§ 247b(k)(1)(A)–247b(k)(8), and the Federal Tort Claims Act, 28 U.S.C. § 1346(b). The suit was then transferred by the Judicial Panel on Multidistrict Litigation to the United States district court for the District of Columbia for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *See generally In re Swine Flu Immunization Products Liability Litigation,* 89 F.R.D. 695, 699 and n. 6 (D.D.C. 1980). Shortly thereafter, the action was remanded to the United States district court for the Western District of Texas for a nonjury trial.

The case was tried on May 26, 1981, and several days later the district court entered its findings of fact and conclusions of law. The court found the United States liable for Ms. Freeman's injury for its failure to fulfill the duty imposed by the Swine Flu Act to warn vaccine recipients of the potential adverse consequences of the vaccine. It also concluded that the United States had failed to obtain the proper informed consent as required by section 247b(j)(1)(F) of the Act. Judgment was rendered in the amount of $11,423.45.

## DISCUSSION

On appeal, the United States alleges that the district court erred in finding liability

1. Ms. Freeman did not recall reading the form before she returned it to the personnel at the

Rosewood Neighborhood Center.

based upon a national standard of care, in not finding the risk of adhesive capsulitis to be an unknown side effect of the vaccine at the time of Ms. Freeman's inoculation, and in applying a subjective rather than an objective standard to determine whether any failure to warn was a producing cause of Ms. Freeman's injury.

1. The Standard of Care:

The district court found the United States liable for Ms. Freeman's injury because it failed to fully warn her of the risks and benefits of the swine flu vaccine and because it failed to obtain the proper informed consent prior to administering the injection. Both conclusions were predicated upon the government's noncompliance with section 247b(j)(1)(F) of the Act, which provided:

> "(j)(1) The Secretary is authorized to establish, conduct, and support (by grant or contract) needed activities to carry out a national swine flu immunization program until August 1, 1977 (hereinafter in this section referred to as the 'swine flu program'). The swine flu program shall be limited to the following:
>
> " . . . .
>
> "(F) The development, in consultation with the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research, and implementation of a written informed consent form and procedures for assuring that the risks and benefits from the swine flu vaccine are fully explained to each individual to whom such vaccine is to be

administered. Such consultation shall be completed within two weeks after enactment of this Act, or by September 1, 1976, whichever is sooner. Such procedures shall include the information necessary to advise individuals with respect to their rights and remedies arising out of the administration of such vaccine." [2]

It is the government's position that this part of the Swine Flu Act only authorizes the development of an informed consent form; that it does not establish a nationwide standard of liability by which the government's performance is to be assessed.

 This is a question of first impression in this Circuit; however, we are guided by the Eighth Circuit's recent disposition of this issue in *Petty v. United States,* 679 F.2d 719 (8th Cir.1982). That decision rejected an interpretation of section 247b(j)(1)(F) similar to that adopted by the district court here, concluding that "[t]his section does not . . . specify statutory standards or establish a duty of care on the part of the Government or program participants." *Id.* at 727. The Court in *Petty* reasoned that section 247b(j)(1)(F) was located in that part of the Swine Flu Act which only directed the implementation of the national immunization program and its various components. *Id.* The wording of the section confirms this interpretation. Section 247b(j)(1) states: "The Secretary is authorized to establish, conduct, and support (by grant or contract) needed activities to carry out a national swine flu immunization program until August 1, 1977 (hereinafter in this section referred to as the

---

2. In its findings of fact the district court noted:
 "3. That Plaintiff . . . did not discuss the nature of the shot with anyone at the clinic [Rosewood Neighborhood Center] or receive warnings of the potential side effects and hazards except as demonstrated by Plaintiff's Exhibits 1 and 2 [quoted in the text]."
 " . . . .
 "7. That Defendant United States of America did not discharge the burden imposed upon it by 42 U.S.C. § 247b(j)(1)(F) of 'assuring that the risks and benefits from the swine flu vaccine are fully explained to each individual to whom such vaccine is administered.' Said failure by the Government constituted negligence on their behalf [*sic*]."

Conclusions of law numbers two and three stated: "2. Defendant United States of America failed to properly warn Plaintiff of the risks and hazards inherent in the swine flu vaccine. 3. That Plaintiff Dovie Freeman did not give any type of informed consent as required by 42 U.S.C. § 247b(j)(1)(F)."
No other findings of fact or conclusions of law reflect any wrongful or tortious action or failure to act on the part of the United States, the Rosewood Neighborhood Center, or any other "program participant" as defined in section 247b(k)(2)(B). *See* note 5, *infra.*

'swine flu program'). The swine flu program shall be limited to the following[.]" This directive is followed by seven lettered subsections specifying the development and procurement of a vaccine, the creation and funding of means to disseminate the vaccine, the initiation of training programs for necessary personnel, and the development of a written informed consent form (the latter being the focus of subsection (F)).[3] We agree with the conclusion reached by the Court in *Petty*. This subsection did not create an independent duty on the part of the United States to its citizens to furnish either warnings or an informed consent form. Section 247b(j)(1) as a whole simply authorized the Secretary to create the national immunization program, and paragraphs (A) through (G) set the parameters of the program so authorized.

Indeed, liability of the government and the program participants is the subject of another section of the Act.[4] Section 247b(k)(2)(A), set out in the margin, imposes liability on the United States for its negligence during the program in accordance with the standards and procedures of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b). Under the FTCA, the United States is liable for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government . . . in accordance with the law of the place where the act or omission occurred." *Id.* Additionally, under section 247b(k)(2)(A)(i) of the Swine Flu Act the United States assumes liability for "the act or omission of a program participant . . . based on any theory of liability that would govern an action against such program participant under the law of the place where the act or omission occurred . . . ."[5]

■ Thus, as the Court recognized in *Petty*, the Swine Flu Act makes the government liable for its own negligent acts or omissions and for the acts and omissions of a program participant based upon any theory of liability; but in both cases the governing substantive standard of care is "the law of the place where the act or omission occurred." 679 F.2d at 726. Furthermore,

---

**3.** The seventh and final such subsection is: "(G) Such other activities as are necessary to implement the swine flu program."

**4.** Section 247b(k)(2)(A) provides:
"The United States shall be liable with respect to claims submitted after September 30, 1976 for personal injury or death arising out of the administration of swine flu vaccine under the swine flu program and based upon the act or omissions of a program participant in the same manner and to the same extent as the United States would be liable in any other action brought against it under such section 1346(b) and chapter 171, except that—
"(i) the liability of the United States arising out of the act or omission of a program participant may be based on any theory of liability that would govern an action against such program participant under the law of the place where the act or omission occurred, including negligence, strict liability in tort, and breach of warranty;
"(ii) the exceptions specified in section 2680(a) of title 28, shall not apply in an action based upon the act or omission of a program participant; and
"(iii) notwithstanding section 2401(b) of title 28, if a civil action or proceeding for personal injury or death arising out of the administration of swine flu vaccine under the swine flu program is brought within two years of the date of the administration of such vaccine and is dismissed because the plaintiff in such action or proceeding did not file an administrative claim with respect to such injury or death as required by such chapter 171, the plaintiff in such action or proceeding shall have 30 days from the date of such dismissal or two years from the date the claim arose, whichever is later, in which to file such administrative claim."

**5.** Section 247b(k)(2)(B) provides:
"(B) For purposes of this subsection, the term 'program participant' as to any particular claim means the manufacturer or distributor of the swine flu vaccine used in an inoculation under the swine flu program, the public or private agency or organization that provided an inoculation under the swine flu program without charge for such vaccine or its administration and in compliance with the informed consent form and procedures requirements prescribed pursuant to subparagraph (F) of paragraph (1) of this subsection, and the medical and other health personnel who provided or assisted in providing an inoculation under the swine flu program without charge for such vaccine or its administration and in compliance with such informed consent form and procedures requirements."

under section 247b(k)(3) the provisions outlined above constitute the "exclusive" remedy for "injury or death arising out of the administration of the swine flu vaccine . . . ." [6] Therefore, since Ms. Freeman, at all times a resident of Texas, received her vaccination in Texas we must look to Texas law for the applicable standard of care.

## 2. Foreseeability Under Texas Law:

■ Ms. Freeman alleged, and the district court based its judgment on the finding, that the United States was negligent, in its own capacity, for not warning her of the risks associated with the swine flu vaccine. Thus, her claim must meet the requirements for a prima facie case of negligence under Texas law. One element of that prima facie case is that the risk in question must have been reasonably foreseeable. *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1088 (5th Cir. 1973); *Crocker v. Winthrop Laboratories*, 514 S.W.2d 429, 433 (Tex.1974) ("If the manufacturer knows or should know of potential harm to a user because of the nature of its product, the manufacturer must give an adequate warning."). In fact, Ms. Freeman acknowledges in her brief that "[t]he Government is correct . . . when it argues that 'foreseeability' is a part of the Plaintiff's cause of action."

■ A review of the evidence presented at trial indicates that Ms. Freeman failed to establish any proof of foreseeability. In November 1976, when Ms. Freeman received the vaccination, the United States was not aware that injection of the vaccine could produce adhesive capsulitis. Moreover, according to the government, the only foreseeable risks of the swine flu vaccine known in 1976 were that minor fever and aches and pain could result and these side effects were discussed in the document given to Ms. Freeman before she took the shot. As to the foreseeability of adhesive capsulitis, plaintiff's medical expert, Dr. Santiago Sanchez, acknowledged that he had reviewed the medical literature and could not find any indication of a swine flu injection being linked to adhesive capsulitis. This was confirmed by the government's medical expert, Dr. Don Johnson, who also testified that a search of the medical literature yielded no indication of any relationship between the swine flu vaccine and adhesive capsulitis.

Ms. Freeman relies upon the testimony of Dr. Sanchez that "[m]ost doctors have that experience that injections of different things, whether it be a vaccine or sometimes penicillin, can cause severe local reactions . . . ." Yet, even this testimony does not support a finding that adverse local reactions were known or should have been known to result in adhesive capsulitis or anything similar thereto. There is no indication that there was anything about swine flu vaccine which made it more likely or capable of causing this reaction than any other vaccine or medicinal injection. The record in this case is devoid of any evidence that the risk of adhesive capsulitis or anything of a similar or related nature was reasonably foreseeable at the time of Ms. Freeman's injection.[7] Therefore, it was not

---

**6.** This subsection provides:

"(3) The remedy against the United States prescribed by paragraph (2) of this subsection for personal injury or death arising out of the administration of the swine flu vaccine under the swine flu program shall be exclusive of any other civil action or proceeding for such personal injury or death against any employee of the Government (as defined in section 2671 of title 28) or program participant whose act or omission gave rise to the claim."

**7.** Dr. Sanchez's opinion that the swine flu vaccine caused the adhesive capsulitis was based *entirely* on the fact that the adhesive capsulitis followed, by about thirty-six hours, the administration of the shot and his general medical knowledge that *other* injections, including penicillin, "can cause severe local reactions." He did not say that he had ever heard (or read) of, either specifically or as a general matter, other instances of adhesive capsulitis following swine flu injections (or, indeed, any other injections). He did not purport to say how or why this shot caused the adhesive capsulitis. He did not purport to identify or describe anything in the chemical or biological makeup or nature of the swine flu vaccine which in his opinion had a tendency or potentiality to bring about such a result. *Most significantly, he never intimated that the swine flu vaccine was more likely or*

negligent for the United States to fail to warn of this side effect.

 Ms. Freeman argues, however, that the government knew of other adverse consequences of the swine flu vaccine and that it did not provide a warning as to these hazards. She then cites her testimony at trial that if anyone had discussed "any possible side effects of the shot" with her she "would not have taken a shot ...."[8] Even assuming that this argument would satisfy the requisites of legal causation for this injury (adhesive capsulitis), we note that the only evidence of other foreseeable side effects that Ms. Freeman produced was the testimony of Dr. Sanchez about adverse local reactions. This was not tied to swine flu vaccine, or any of its components, as distinguished from vaccine or medicinal injections in general. While the government is required to warn vaccine recipients of reasonably foreseeable side effects, that requirement does not extend to all potential adverse consequences no matter how inconsequential or infrequent and how little related to this particular vaccine as distinguished from vaccine or medicinal injections generally. The broadly defined classification of "adverse local reactions" falls within this category. Neither Dr. Sanchez's testimony, nor any other evidence, gave any indication of either the severity or frequency of such reactions. Under these circumstances, it could not have been incumbent upon the government to issue a warning as to adverse local reactions.

---

*more capable of bringing about this result than penicillin or any other vaccine or injection.*

We note that some 48,000,000 swine flu vaccinations were given under the Swine Flu Act. *See Young v. United States,* 542 F.Supp. 1306, 1307, 1310 n. 4 (S.D.N.Y.1982). So far as this record shows, there is only one other reported instance of adhesive capsulitis allegedly resulting from the swine flu vaccine. This incident eventuated in litigation in which the court ruled that it was not shown that the adhesive capsulitis resulted from the injection. *Burnette v. United States,* No. 78-0147(D) (W.D.Va., September 16, 1980) (unreported).

**8.** Ms. Freeman's testimony in this respect, given on direct examination by her counsel, was as follows:

---

### 3. The Standard for Producing Cause:

Because our disposition of the foreseeability issue precludes plaintiff's recovery in this case, it is unnecessary to decide whether Texas determines producing cause from a subjective or an objective point of view.

The judgment of the district court is reversed.

REVERSED.

---

"Q Mrs. Freeman, did you receive when you got the shot itself, when you were back at the Rosewood Center did anybody give you any warning of any kind that this might affect your shoulder the way it has?
"A No.
"Q Did anybody discuss any possible side effects of the shot with you?
"A No.
"Q If they had, what would you have done, Mrs. Freeman?
"A I would have got in my car and left. I would not have taken a shot that—I wouldn't gamble on that."