**Robert L. PETTY, Appellee,**

v.

**UNITED STATES of America, Appellant.**

**No. 83–1696.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 13, 1983.

Decided Aug. 3, 1984.

Rehearing and Rehearing En Banc Denied Nov. 2, 1984.

Evan L. Hultman, U.S. Atty., Ceder Rapids, Iowa, J. Paul McGrath, Asst. Atty. Gen., Mary McElroy Leach, Jeffrey Axelrad, Dept. of Justice, Washington, D.C., for appellant.

Wiley Mayne, John D. Mayne, Sioux City, Iowa, for appellee.

Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BRIGHT, Circuit Judge.

LAY, Chief Judge.

Robert L. Petty filed suit against the United States for compensatory damages under the Swine Flu Act, 42 U.S.C. § 247b(j)–(*l*) (1976), in conjunction with the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80. The district court, the Honorable Donald E. O'Brien presiding, found the United States liable under negligence and strict liability theories. Petty was awarded $212,802.22 in damages. *Petty v. United States*, 536 F.Supp. 860 (N.D. Iowa 1980). The judgment was vacated on appeal and the case remanded to the district court with directions to make express determinations of the government's liability under Iowa law. *Petty v. United States*, 679 F.2d 719 (8th Cir.1982). On remand, the district court found the United States liable under Iowa law on negligence and strict liability theories for failing to provide Petty with an adequate warning of the known risks of the swine flu vaccination and reinstated the damages award. *Petty v. United States*, 592 F.Supp. 687, (N.D.Iowa 1983). This appeal followed.

On appeal, the government contends that the district court's findings were clearly erroneous in that: (1) the risk of developing serum sickness was not reasonably foreseeable at the time the vaccine was administered; therefore no duty to warn arose under Iowa law; (2) if such a duty arose, the warning given was not inadequate under Iowa law; and (3) if the warning was inadequate, the lack of an adequate warning was not the proximate cause of Petty's illness. The government also appeals from the district court's decision holding the drug manufacturer strictly liable. Our prior opinion affirmed the trial court's finding that the swine flu shot did in fact cause Petty's injuries. 679 F.2d 729. This finding is the law of the case and is not challenged on appeal.

Petty received the swine flu shot on October 31, 1976, pursuant to the National Swine Flu Immunization Program,[1] at a vaccination center operated by the Sioux

---

1. A more thorough discussion of the facts can be found in Judge Bright's earlier opinion. 679 F.2d at 722–24. For a more extensive discussion of the history and purpose of the Swine Flu Program, see *Sparks v. Wyeth Laboratories, Inc.*, 431 F.Supp. 411 (W.D.Okla.1977), and *Unthank v. United States*, 732 F.2d 1517 (10th Cir.1984). Under the liability provisions of the Act, the United States is substituted as the defendant in the place of any "program participant," *i.e.* a vaccine manufacturer, in any action for injuries or death resulting from the Swine Flu Program. 42 U.S.C. § 247b(k)(1)(B), (k)(3). For actions

City-Woodbury County Health Department, under the direction of the Iowa State Health Department. Prior to the inoculation, Petty received and "skimmed" a form that related information about swine flu, possible side effects of the vaccine and Special Precautions. *Reprinted infra* p. 6–7. On November 8, 1976, Petty began to experience aching, numbness, and tingling sensations in his muscles and joints. His condition deteriorated and he was hospitalized on November 12, 1976. An initial diagnosis of congestive heart failure was changed to serum sickness. At the time of the original trial, Petty still experienced aching joints and a persistent lack of strength. He has since recovered about 75% of his prior effectiveness.

*Foreseeability*

■ Under Iowa law, the duty to warn in a negligence action is triggered by the "reasonable foreseeability" of the particular injury sustained. *See, e.g., Lakatosh v. Diamond Alkali Co.,* 208 N.W.2d 910, 913 (Iowa 1973); *Davis v. Coats Co.,* 255 Iowa 13, 19, 119 N.W.2d 198, 202 (1963). Our prior opinion made it clear that finding "an undifferentiated duty" to warn of the risks and benefits of receiving the swine flu vaccine was insufficient to establish the government's liability for failure to warn specifically of serum sickness. 679 F.2d at 728. The question remanded was whether serum sickness and its symptoms were reasonably foreseeable and, if so, whether the government adequately warned of the risk.

The district court on remand found that "[t]he facts of this case clearly show that the dangers of serum sickness and abortive neuropathy from flu vaccines were well known in the medical community for a number of years prior to 1976." 592 F.Supp. at 690.[2] The court based its finding on the testimony of Dr. Clark Hyden,

---

based on the act or omission of a program participant, the United States is subject to liability on any ground or theory that the program participant, the United States is subject to laibility on any ground or theory that the program participant would be held liable under the law of the state where the act or omission occurred. *Id.* at § 247b(k)(2)(A)–(k)(3). Where the government is held liable for negligent actions of a program participant, the government has a right of action over that program participant; however, for any liability sustained against a program participant on a strict liability theory, the government sits "in the shoes" of the program participant and bears any costs. *See id.* at § 247b(k)(7). Concurrently, the Act subjects the United States to liability for its own acts or omissions under the strictures of the Federal Tort Claims Act, accordingly, the government's liability is limited to negligent actions. *Id.* at § 247b(k)(2)(A).

**2.** On appeal, the government contests the district court's apparent linking of serum sickness and neurological reactions. The government's primary thrust appears to be that there exists no evidence that abortive neuropathy is a known disease or that Petty in fact suffered from it or a neurological disease; therefore, evidence bearing on the government's awareness of neurological reactions is not relevant to the reasonable foreseeability of serum sickness. The plaintiff characterizes abortive neuropathy as a nervous disorder that accompanies serum sickness.

Explaining his diagnostic characterization of Petty's illness as an "abortive neuropathy," Dr. Hyden, Petty's treating physician, stated that Petty's initial symptoms "were those of ascending neuropathy, but this did not progress. It did not continue and become worse. Instead, it went away or became submerged in his symptoms of myalgia and arthralgia, and so it started out but it did not continue." Tr. at 119–20. We are satisfied that Dr. Hyden was not using "abortive neuropathy" to depict a specific disease, but rather was using it as a descriptive phrase in his diagnosis in the sense that the disease began as a neurological condition but did not progress as such.

At the trial level the government asserted that the specific ailment that Petty sustained was not critical because, regardless of whether it was described as a neurological complication or serum sickness, it was a "severe reaction," of which he was adequately warned. In his opening statement at trial, counsel for the government stated to the court:

Now, whether we said "neurological complications" or that he might get serum sickness reaction or autoimmune repercussions, the diagnoses that might be possible that he's complained of following the administration of the drug is immaterial, as long as we said it was a severe reaction. And I think that in terms of—without going to the question of causation of the symptoms, that the symptoms were in fact a severe reaction; and the government would admit that the symptoms he complained of were a severe reaction.

Thus, *at trial* no serious contention was made by the government or its witnesses that serum sickness did not involve neurological symptoms or affects.

Dr. Joseph Bellanti, Dr. Charles Poser, and Dr. Hattwick.

Upon review of the record, we find that the testimony supports the district court's conclusion that serum sickness and its symptoms were a recognized reaction to the Swine Flu vaccination. Serum sickness was defined by Dr. Hyden, Petty's treating physician, as being "a Type 3 hypersensitivity reaction in which a foreign protein is ingested or injected, which evidently sets up an antigen-antibody reaction, which in turn activates certain proteins which produce an inflammatory reaction throughout the body. This is called antigen excess disease or immune complex disease." Tr. at 115–16. Dr. Hyden testified that serum sickness was a disease of long standing well known in the medical literature caused when a foreign protein, such as in the vaccine here, is injected into the body. Dr. Bellanti, an immunologist and Director of the Center for Interdisciplinary Study of Immunology, similarly defined serum sickness as an antigen-antibody complex that results in redness, inflammation and swelling of the joints. This generalized disease was named serum sickness in the days when horse serum was used to treat infectious diseases. Although serum is not used often anymore, Dr. Bellanti testified that the same reaction—a serum sickness-like disease—is one of the recognized reactions to a vaccination.

 In a case tried to the court without a jury, the court sits as the exclusive finder of fact. The district court has the task of resolving conflicts in the evidence by appraising credibility, weighing the evidence, and drawing inferences. Although a different trier of fact may have found differently, we conclude that on the basis of the testimony presented there was substantial evidence to support the district court's finding that serum sickness and its symptoms were foreseeable. We cannot say that the court's finding reflects that a clear mistake has been made. Fed.R.Civ.P. 52(a). Accordingly, we affirm the district court's finding that the government was under a duty to warn vaccine recipients of the risk of serum sickness.

*Adequacy of the Warning*

Finding that the risk of serum sickness was reasonably foreseeable, we move now to the second issue raised on appeal, to wit, whether the government's warning[3] was

---

**3.** The warning provided to Petty reads as follows:

IMPORTANT INFORMATION
ABOUT SWINE INFLUENZA
(FLU) VACCINE
(MONOVALENT)
July 15, 1976
The Disease
Influenza (flu) is caused by viruses. When people get flu they may have fever, chills, headache, dry cough or muscle aches. Illness may last several days or a week or more, and complete recovery is usual. However, complications may lead to pneumonia or death in some people. For the elderly and people with diabetes or heart, lung, or kidney diseases, flu may be especially serious.
It is unlikely that you have adequate natural protection against swine flu, since it has not caused widespread human outbreaks in 45 years.
The Vaccine
The vaccine will not give you flu because it is made from killed viruses. Today's flu vaccines cause fewer side effects than those used in the past. In contrast with some other vaccines, flu vaccine can be taken safely during pregnancy.

One shot will protect most people from swine flu during the next flu season; however, either a second shot or a different dosage may be required for persons under age 25. If you are under 25 and a notice regarding such information is not attached, this information will be provided to you wherever you receive the vaccine.
Possible Vaccine Side Effects
Most people will have no side effects from the vaccine. However, tenderness at the site of the shot may occur and last for several days. Some people will also have fever, chills, headache, or muscle aches within the first 48 hours.
Special Precautions
As with any vaccine or drug, the possibility of severe or potentially fatal reactions exists. However, flu vaccine has rarely been associated with severe or fatal reactions. In some instances people receiving vaccine have had allergic reactions. You should note very carefully the following precautions:
 Children under a certain age should not routinely receive flu vaccine. Please ask about age limitations if this information is not attached.

inadequate under Iowa law to warn the plaintiff. To determine the adequacy of the warning, the district court relied on Iowa law:

A duty to warn depends on superior knowledge and is said to exist when one may reasonably foresee danger of injury or damage to one less knowledgeable unless adequate warning of danger is given. It is this reasonable foreseeability which triggers the obligation to warn, which must be determined by the circumstances of each case.

592 F.Supp. 687 (quoting *Lakatosh v. Diamond Alkali Co.*, 208 N.W.2d 910, 913 (Iowa 1973)). Having determined that the risk of serum sickness was reasonably foreseeable, thereby triggering the duty to warn, the court then assessed the adequacy of the warning under Iowa law.

· Although "seriously questioning" the applicability of Iowa's Informed Consent Statute, Iowa Code § 147.137 (1975),[4] the district court found that the statutory prerequisites to a presumption of informed consent were not satisfied; therefore, the statutory presumption could not alleviate the government's liability. The court primarily

relied on the lack of specificity of the warning:

The consent form given to the plaintiff failed to set forth the known risk of loss of function of any organ or limb. This symptom of serum sickness is one major element of plaintiff's damages. Thus, the Iowa informed consent law could not relieve the defendant of its liability for failure to warn of known dangers.

Id. at 690. Petty clearly sustained disabilities such as those described in section 147.137(1). In particular, Petty's symptoms included inflammation of the heart (an organ) and of the heart muscle causing an impairment of function and endangering his life. The warning, however, makes no specific mention of this risk.

■ The government contends that the statute requires risks to be set forth only "in general terms," and that the warning's reference to "severe or potentially fatal reactions" satisfies that requirement. We must respectfully disagree. First, the statute mandates that the presumption of informed consent arises if the writing "sets forth in general terms the nature and purpose of the procedure ... together with the known risks ...." It is not at all clear that

---

People with known allergy to eggs should receive the vaccine only under special medical supervision.

People with fever should delay getting vaccinated until the fever is gone.

People who have received another type of vaccine in the past 14 days should consult a physician before taking the flu vaccine.

*If you have any questions about flu or flu vaccine, please ask.*

Petty also signed the following registration form, which was attached to the information sheet:

REGISTRATION FORM

I have read the above statement about swine flu, the vaccine, and the special precautions. I have had an opportunity to ask questions, ... and understand the benefits and risks of flu vaccination. I request that it be given to me or to the person named below of whom I am the parent or guardian.

4. The Iowa Informed Consent law creates a presumption of informed consent when the statutory prerequisites are satisfied. The statute provides:

A consent in writing to any medical or surgical procedure or course of procedures in patient care which meets the requirements of

this section shall create a presumption that informed consent was given. A consent in writing meets the requirements of this section if it:

1. Sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, or disfiguring scars associated with such procedure or procedures, with the probability of each such risk if reasonably determinable.

2. Acknowledges that the disclosure of that information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner.

3. Is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent, is signed by a person who has legal authority to consent on behalf of that patient in those circumstances.

Iowa Code § 147.137 (1975).

the generality allowed for description of the procedure also applies to the description of the risks. In light of the specificity of the statutory language detailing certain risks, we find that the statute does not allow risks to be stated with the same generality applicable to the procedure. Second, even assuming that it did, for the same reasons discussed below, we find that the generality of the warning was insufficient to encompass the specific risk of serum sickness. Thus, without determining the applicability of the statute,[5] we affirm the district court's conclusion that the prerequisites to the statutory creation of a presumption of informed consent were not satisfied.

The government contends that the reference to "severe or potentially fatal reactions," coupled with the directive to ask questions is adequate under Iowa law to discharge its duty to warn. The government contends that the risk of death encompasses lesser risks such that inclusion of a more specific risk would not have enlightened recipients or affected their decision to be inoculated. Some district courts have made findings that the government's warning was reasonable.[6] However, in this case we are presented with findings made by a different trier of fact on an obviously different record, and applying the law of Iowa.

To be sure, there is a logical symmetry to the argument that acceptance of the risk of death implies acceptance of the risk of something less extreme. Judge O'Brien, however, made a finding to the contrary. Id. at 692. The only circuit court to have passed on this question affirmed a finding of inadequacy, in accordance with Judge O'Brien's rationale. *Unthank v. United States*, 732 F.2d 1517 (10th Cir. 1984). In *Unthank* the Tenth Circuit held that a warning identical to that given Petty was inadequate as a matter of law to apprise the plaintiff of the known risk of transverse myelitis. *See also Hasler v. United States*, 517 F.Supp. 1262, 1268 (E.D.Mich.1981), *rev'd on causation grounds*, 718 F.2d 202 (6th Cir.1983) (warnings given to the plaintiff were minimal and so bland that no reasonable person would consider himself or herself to be in any danger whatever from taking the drug); *Claxton v. United States*, No. EP–78–CA–142 (W.D.Tex. May 31, 1983) (warning was wholly inadequate to inform a reasonable, prudent person of the known risk of severe neurological complications and was misleading in that it was presented as more of a disclaimer than a warning).[7]

Buttressed by its finding that serum sickness was a known, foreseeable risk, the district court found that the information sheet provided Petty did not adequately

---

**5.** Serious questions are raised about the applicability of the statute. For example, it is not clear whether a vaccine recipient in a mass immunization context is a "patient" undergoing "patient care."

**6.** *See Daniels v. United States*, 704 F.2d 587 (11th Cir.1983) (Alabama law) (warning was "reasonable"). The following district courts also found that a warning of potentially severe or fatal reactions encompasses more specific reactions, such that the inclusion of the words neurological disorders would have been superfluous. *See, e.g., Butler v. United States*, No. 80–3110 (S.D.W.Va. May 18, 1983); *Gilroy v. United States*, No. 79–597 (M.D.Pa. June 16, 1983) (Pennsylvania law); *Bean v. United States*, 533 F.Supp. 567 (D.Colo.1980) (Colorado law).

**7.** The government contends that *Claxton* does not support Petty's case. First, the plaintiff in *Claxton* sustained Guillain-Barre Syndrome (GBS). Because the government has conceded

liability in GBS cases, *see, e.g., Overton v. United States*, 619 F.2d 1299 (8th Cir.1980), the court's discussion of the adequacy of the warning was dictum. Second, the government contends that *Claxton* is undermined by subsequent Fifth Circuit rulings to the contrary in *Daniels v. United States*, 704 F.2d 587 (11th Cir.1983) (warning was reasonable under Alabama law) and in *Freeman v. United States*, 704 F.2d 154 (5th cir.1983) (risk of adhesive capsilitus not foreseeable enough to require a warning). Both of these cases are distinguishable and not persuasive. In *Daniels* the court applied Alabama law, which imposes a "reasonableness" standard. Iowa law, however, applies a more stringent disclosure standard under the patient rule. *Freeman* applied Texas law, as did *Claxton;* however, the Fifth Circuit found that no warning of the possibility of plaintiff's malady was required, therefore, the Fifth Circuit's discussion of the adequacy of the warning is also dictum, and we find that it is less relevant or persuasive dictum than in *Claxton*.

warn him of the risk of serum sickness. We hold that this finding of inadequacy is in accordance with Iowa law and is clearly supported by the evidence.

Expert testimony supports Petty's contention that the generality of the warning, especially in the context of the government's unprecedented promotional campaign, was insufficient to have enabled Petty to give an informed consent to receiving the vaccine.[8] Dr. Modell, a physician and member of various advisory committees to the Food and Drug Administration, testified that the information form was more an attempt to sell the program than an unbiased presentation of the vaccine's risks and benefits. In particular, Dr. Modell testified that "severe or potentially fatal reactions" says nothing about a neurological reaction. Similarly, Dr. Hattwick, Director of the National Influenza Immunization Program, Surveillance and Assessment Center, and on the Center for Disease Control staff of the Bureau of Epidemiology, testified that phraseology decisions were made "to encourage participation." Because those in charge were clearly aware of the specific neurological risks, it was Dr. Hattwick's assessment that they must have determined that it was more prudent not to mention or stress these risks. He testified that more specificity could have been confusing, by which he meant that participation would have been hampered. Dr. Katz, a Professor of Law and Psychiatry at Yale University, also testified that the warning was an attempt to induce participation and was inadequate to enable recipients to render an informed consent. On the basis of this testimony, the court could find that under Iowa law, the government's information form inadequately warned the specific, known risk of serum sickness.[9]

We also reject the government's contention that the reference to death encompasses all risks and their effects on grounds of Iowa law. We find that in this case Iowa law would mandate that the adequacy of the warning be assessed under the patient rule standard. *Compare Cowman v. Hornaday*, 329 N.W.2d 422 (Iowa 1983) (patient rule governs physician's duty to disclose the known risk of testicular atrophy to healthy patient seeking a vasectomy purely for socio-economic reasons) *with Grosjean v. Spencer*, 258 Iowa 685, 140 N.W.2d 139 (1966) (professional rule governs physician's duty to disclose risk of peritonitis to severely ill patient). Under the patient rule standard, an individual must be advised of the inherent and potential hazards of the proposed treatment, any alternative methods of treatment, the risks attendant to such alternatives, and the likely results of remaining untreated. *See Cowman*, 329 N.W.2d at 425; *Canterbury v. Spence*, 464 F.2d 772 at 787–88; *Cobbs v. Grant*, 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1, 10 (1972). The duty to disclose is limited not only to reasonably foreseeable risks, but also to material risks. *See Cowman*, 329 N.W.2d at 425 (quoting *Wilkinson v. Vesey*, 110 R.I. 606, 627, 295 A.2d 676, 689 (1972)). We have found that the risk of serum sickness and its symptoms was known and that the vaccine subjected healthy recipients to serious debilitating

---

8. Although we recognize the hard sell campaign as it bears on the context, and therefore, the adequacy of the warning, we emphasize that we are not passing on the government's good faith in its promotional efforts or on the ultimate necessity of the program.

9. We also note that the government has conceded that the swine flu vaccine can cause GBS. Stipulation and Final Pretrial Order, Paragraph IX *In Re Swine Flu Immunization and Products Liability Litigation* M.D.L. No. 330, Misc. No. 78–0040 (D.D.C.1979). Explaining why the government decided to provide compensation to GBS sufferers merely upon an adequate causation presentation, Secretary Califano stated:

First, the informed consent form ... did not warn individuals that there was a one in one hundred thousand risk that a person receiving a flu shot would contract Guillain-Barre and that one in every two million would die from the condition ... Second, in the Swine Flu program, the Federal Government, in an unprecedented effort actively urged millions of Americans to get flu vaccination shots and funded the nationwide campaign.

Statement of Secretary Califano (June 20, 1978). If the dissent is correct that the warning provided Petty was adequate to apprise him of the risk of serum sickness, we fail to see why it is inadequate to apprise of the risk of GBS.

complications. *See Petty,* 679 F.2d at 723. Moreover, Petty was a healthy person who voluntarily received the vaccine, thus presumably foregoing the vaccination was a viable alternative. Disclosure of the risks would have been "of significance" to a vaccinee's decision to be inoculated. Accordingly, we find that the risk of serum sickness and its symptoms was material and, there being no justifiable argument to the contrary, under the patient rule standard, it should have been disclosed.

We reject the government's contention that a reference to death satisfies its duty to warn for another reason also. Were this undifferentiated warning found to satisfy the duty to warn, which under Iowa law requires disclosure of all risks reasonably foreseeable, then the duty to warn would become very hollow indeed. Death can result from virtually any treatment. Moreover, the risk of death may be conceptually remote, whereas a more specific warning detailing the known risk of serum sickness and its symptoms would alert recipients more concretely to the risks that they actually were assuming. However, the warning given Petty made no attempt to disclose the physiological source of the possible reactions or to advise the recipients of the likely results of foregoing the vaccination, or of any alternative methods of protection and the risks attendant thereto. The patient rule requires the disclosure of these issues in order to obtain an informed consent. The vagueness of the warning, and thus its potential inadequacy, is enhanced by the placement of the warning under "Special Precautions," which implies either that these risks can be guarded against, or that they apply only in special cases. The disclosure here was merely a broad, generic statement. The alleged warning here did more to dilute the seriousness of the risks at stake than it did to apprise the recipients of the existence of those risks. Indeed, it appears that assuring participation was the motivation behind the phraseology decisions rather than an effort to inform the recipients of the risks.

Finally, we find that the vagueness of the generic warning is not mitigated by the invitation to ask questions. In some situations and for some individual idiosyncrasies, it may be necessary to rely on recipients' questions to complete the picture of risks and benefits or to clarify issues raised. This was not such a situation. Here the warning that was given was insufficient to spark the concerns that would have engendered questions. Moreover, it seems unrealistic to believe that the anonymity of a mass immunization context would foster an atmosphere in which questions were likely to be asked or answered thoroughly.

In conclusion, we hold the district court's finding that the warning did not encompass the specific, known, and material risk of serum sickness and its symptoms to be supported by the evidence and is not clearly erroneous. Consequently, under Iowa law it did not provide an adequate basis for Petty to make an intelligent, informed consent.

*Causation*

To recover Petty also must establish the causal relationship between the government's failure to disclose and the injuries he sustained. *See Cowman,* 379 N.W.2d at 426. The causal relationship exists when it can be shown that had Petty been warned appropriately, he would have forgone the shot. We again look to Iowa substantive law.

It appears that traditionally under Iowa law Petty would have to satisfy a subjective standard of causation to establish liability. *Perin v. Hayne,* 210 N.W.2d 609, 618 (Iowa 1973). This would require establishing that he, Robert Petty, would not have been vaccinated had he been adequately warned. The district court, however, applied a rebuttable presumption to the causation issue. The court presumed that, had Petty been adequately warned, he would have acted to minimize the risk. *See Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1281 (5th Cir.1974). The court relied primarily on the government's "hardsell" approach to the swine flu immunization program to justify the use of a burden-shifting presumption. Finally, the court

relied on Petty's testimony to find that the United States had not rebutted the presumption:

> Mr. Petty testified that adequate warnings would have helped him in that they would have enabled him to make a more informed judgment. This testimony provides the basis for this Court's opinion that Mr. Petty was in fact concerned about making an informed decision. For these reasons, the Court concludes that plaintiff has shown that the failure of the defendant to properly warn was the proximate cause of plaintiff's injuries.

592 F.Supp. at 691.

On appeal the Government contends that the district court's prediction that Iowa would not abide by *Perin* is undermined by the Iowa Supreme Court's subsequent reaffirmation of the viability of *Perin* in *Cowman. Cowman,* 329 N.W.2d at 424. The government contends that Petty has not satisfied the subjective standard of causation as required by *Perin.* The government relies on Petty's testimony that he did not know what neurological disorders were and his admission that the alleged inadequacies in the informed consent related to matters that would not have enlightened his decision. The government also relies on the opportunity afforded Petty to ask questions. Second, the government contends that if *Reyes* is applicable, then the opportunity to ask questions and Petty's testimony, which suggests that a warning would not have been enlightening, are sufficient to rebut the causal presumption. In *Reyes* the Fifth Circuit found that the presumption was not rebutted; however, no warning had been given and no evidence rebutting the presumption had been presented. The government contends that because a warning, albeit allegedly inadequate, was provided and not heeded, any causal connection between the inadequacy of the warning and the plaintiff's injuries is rebutted.

■ We affirm the district court's application of a rebuttable presumption to the proximate cause issue. The district court relied on the factual distinctions between the physician-patient situation present in *Perin* and the mass-immunization context of this case to justify the use of the rebuttable presumption in place of the more traditional subjective standard. Despite the reaffirmance of *Perin* in *Cowman,* the relevant and critical factual distinctions between our case and *Perin* used to justify the presumption were not present in *Cowman.* In contrast to *Perin* and *Cowman,* we are presented with a mass-immunization case. There were viable alternatives for Petty, yet he received treatment without a warning apprising him of the risks and benefits and without an initial individualized balancing of the risks and benefits by a learned intermediary. Additionally, there is a public policy consideration favoring allocating the risk of loss among the distributors who can then absorb the cost or distribute it more easily. *See Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1294 (5th Cir.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974);[10] *see also id.* at 1294 n. 57 (recognizing view that burden should be born by the government because of the societal benefit bestowed by individuals receiving the vaccine). In sustaining the causal presumption, we are also influenced by the "hard sell" public relations campaign pursued by the government. The campaign not only encouraged participation but also greatly minimized the impact of the warning. *See Givens v. Lederle,* 556 F.2d 1341 (5th Cir.1977); *Reyes v. Wyeth Laboratories,* 498 F.2d 1264 (5th Cir.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974).

■ Finally, we affirm the district court's finding that the causal presumption has not been rebutted. The government's distinction between no warning, as in *Reyes,* and an inadequate warning is unpersuasive. The inadequacies present in the generic warning here do not support the inference that Petty would not have heeded an adequate warning. The warning was

---

**10.** In *Reyes,* the Fifth Circuit also justified the causal presumption by recognizing that testimony as to what would have been done had there been an adequate warning would have been self-serving and speculative. *Reyes,* 498 F.2d at 1281–82.

inadequate in part because of the calculated ambiguity of its terms and because it was couched in terms that lulled the recipient into a false sense of security. Similarly, the opportunity to ask questions does not in itself rebut the presumption. As addressed earlier, the anonymity of a mass-immunization context does not encourage questions nor was the warning sufficient to spark the concerns necessary to incite meaningful questions. Finally, the district court found, as a finding of fact, that the presumption had not been rebutted. In so finding, the court apparently found Petty's testimony that he would have found more information helpful, more persuasive than the testimony cited by the government. Although different triers of fact may have come to different conclusions, there is substantial evidence in the record to support the court's finding and we cannot say that the court's finding was clearly erroneous. Fed.R.Civ.P. 52(a).

■■■ The government also asserts that the district court's attempt to distinguish *Perin* is jurisdictional error. The government alleges that its "hardsell" approach was within the discretionary function exemption to the Federal Tort Claims Act, 28 U.S.C. § 2680(a) (1970); accordingly, those actions are not a valid jurisdictional basis for the imposition of liability. The actions of the President of the United States in his attempts to sell the program, however, were not used as a basis of imposing liability. The evidence was used to support the application of a burden-shifting presumption. Thus, reliance on these actions is not jurisdictional error. Accordingly, we find that the government is liable under a negligence theory to Petty for the injuries he sustained as a result of his swine flu inoculation.

*Strict Liability*

Alternatively, the district court found that the drug manufacturer, Merrill-National, had a duty to warn the ultimate recipient of the vaccine. Furthermore, the district court found that Iowa, if presented with the facts of the instant case, would hold the drug manufacturer strictly liable for a breach of its duty to warn. The district court relied on Iowa's adoption of Section 402A of the Restatement (Second) of Torts, *see Hawkeye Security Ins. Co. v. Ford Motor Co.*, 174 N.W.2d 672, 684 (Iowa 1970), and of comment j thereto, *see Cooley v. Quick Supply Co.*, 221 N.W.2d 763 (Iowa 1974), to reason that Iowa also would adopt comment k to Section 402A. Comment k recognizes that some products, such as drugs, are unavoidably unsafe; however, because their benefits outweigh the risks, if properly prepared and accompanied by proper warnings, the product is, by definition, neither defective nor unreasonably dangerous. The swine flu vaccine would thus be classified as a justified, but unavoidably unsafe product; however, because the warning was inadequate, the vaccine was unreasonably dangerous, rendering the drug manufacturer strictly liable. Because Merrill-National was a "program participant," 42 U.S.C. § 247b(k)(2)(B) ("program participant" includes, *inter alia,* the manufacturer of the swine flu vaccine), the liability scheme of the Swine Flu Act imposes this liability on the United States. *See id.* at § 247b(k)(7).

On appeal, the government contends that the drug manufacturer did not have a duty to warn. It argues that section 247b(j)(1)(F), which authorizes the Secretary to develop and implement a written informed consent, statutorily places the sole duty to warn on the government.[11] Thus, any defect or inadequacy of the warning should be attributed solely to the government. Because the government's liability for its own acts or omissions is assessed under the Federal Tort Claims Act, *see* 42 U.S.C. § 247b(k)(2)(A), Petty is limited to a negligence claim. *See Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

---

**11.** We recognize that both the government and the drug manufacturers intended the government to assume the duty to warn. *See* 42 U.S.C. § 247b(j)(1)(F); *cf.* Cong. Rec., Aug. 10, 1976 at 26799 (Rep. Rogers relating that the manufacturers wanted to clarify that the duty to warn vaccinees, which had been put on the manufacturer in the *Davis* and *Reyes* polio cases, would lie with the government); *see also* Cong. Rec., Aug. 10, 1976 at 26802, 26815.

 We affirm the district court's holding that Iowa law would impose a duty to warn on the drug manufacturer, and that that duty to warn would extend to the ultimate consumer in a mass-immunization case. *See, e.g., Stanback v. Parke, Davis & Co.*, 657 F.2d 642, 646–47 (4th Cir.1981); *Givens v. Lederle*, 556 F.2d 1341 (5th Cir. 1977); *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121 (9th Cir.1968). Moreover, we affirm the finding that Iowa would hold the drug manufacturer strictly liable for the breach of this duty if presented with such a case. *See Hawkeye Security Ins. Co.*, 174 N.W.2d 672 (Iowa 1970); *Kehm v. Proctor & Gamble*, 724 F.2d 613 (8th Cir.1983); *see also Aller v. Rodgers Machinery Mfg. Co.*, 268 N.W.2d 830 (Iowa 1978).

 We recognize that the government has attempted to statutorily assume the duty to warn the vaccinees, however, we do not find that this delegation thereby relieves the manufacturer from liability for any resulting inadequacy of the warning. The duty to warn is imposed on the manufacturer and in a mass-immunization context, where there is no learned intermediary, the duty extends to the ultimate recipient of the vaccine. Delegation of the duty does not, in itself, relieve the manufacturer of its obligation, nor should it insulate the manufacturer from liability for deficiencies in the manner in which the chosen intermediary effectuates the manufacturer's duty. Although on the side lines, Merrill-National is assumed to have had knowledge of the warning issued and to have had the ability to affect the warning.

In defending against liability for its own acts or omissions in the warning, the government argued that it had no duty to warn of the risk of serum sickness and its symptoms because they were not foreseeable. The government urges that for duty to warn cases involving drugs, negligence, and strict liability are functionally and analytically similar causes of action; therefore, the same lack of foreseeability of the risk should relieve the drug manufacturer for any liability for the lack of a warning of the risk. *See Deluryea v. Winthrop Laboratories*, 697 F.2d 222 (8th Cir.1983). As a factual matter, we have found that the evidence supports the district court's finding that serum sickness was a foreseeable risk. Whether this finding is supported by the evidence, however, is irrelevant to the program participant's liability for failure to warn under a strict liability theory under Iowa law.

 As the government contends, the *Deluryea* panel did find that a strict liability action for failure to warn was similar to one based on negligence where drugs are involved. This finding was based on Arkansas law, as reflected in the district court's jury instruction, which had injected notions of foreseeability into the determination of strict liability. Here we apply Iowa law. While recognizing that the terminology in negligence and strict liability actions may be similar and that the terminology "rings in negligence," Iowa clearly recognizes the analytical distinction between the two causes of action in duty to warn cases. *Aller v. Rodgers Machinery Mfg. Co.*, 268 N.W.2d 830, 834–36 (Iowa 1978); *see also Sterner v. United States Plywood Champion Paper, Inc.*, 519 F.2d 1352, 1354 (8th Cir.1975); *cf. Kehm v. Proctor & Gamble*, 724 F.2d 613 (8th Cir.1983) (Lay, C.J., concurring). In *Aller*, the Iowa court explicitly recognized the difference between the two theories of liability, stating:

> In strict liability the plaintiff's proof concerns the condition (dangerous) of a *product* which is designed or manufactured in a particular way. In negligence the proof concerns the reasonableness of the manufacturer's *conduct* in designing and selling the product as he did. *Phillips v. Kimwood Machine Co.*, 269 Or. 485, 493–95, 525 P.2d 1033, 1037 (1974).

*Id.* at 835 (emphasis added). Accordingly, negligence liability focuses on whether the defendant-manufacturer knew or should have known of some foreseeable harm arising from the use of the product. In contrast, a strict liability action focuses not on the manufacturer's conduct or knowledge, but on whether the product, as marketed,

is defective. In order to focus on the product in strict liability actions, courts have imputed knowledge of the risk to the manufacturer. *See, e.g., Phillips v. Kimwood Machine Co.,* 269 Or. at 492, 525 P.2d at 1036. The relevant question is then whether the product "is so harmful to persons [or property] that a reasonable prudent manufacturer [supplier] with this knowledge would not have placed it on the market." *Robbins v. Farmers Union Grain Terminal Ass'n,* 552 F.2d 788, 795 n. 15 (8th Cir.1977) (quoting *Phillips v. Kimwood Machine Co.,* 525 P.2d at 1040–41 n. 16), *see also Aller,* 268 N.W.2d at 836 (equating *Phillips'* test, with its emphasis on the seller, with the consumer-expectations test applied in Iowa).

Applied to our case, we determine the drug manufacturer's liability under strict liability, by assuming knowledge of the risk of serum sickness. Then the issue is whether the manufacturer, with such knowledge, has distributed an unreasonably dangerous product. In light of comment k of section 402A, the unreasonable dangerousness of this unavoidably unsafe product turns on whether the warning given with the product adequately apprises the recipient of those dangers. This issue has already been resolved: the warning is inadequate to apprise Petty of the known risk of serum sickness and its symptoms.

We have found that Merrill-National had a duty to warn Petty and that the warning was inadequate to discharge its duty. Administered without an adequate warning, the swine flu vaccine was defective, hence unreasonably dangerous. Had the manufacturer warned of serum sickness, the warning would presumably have had the same effect as one issued by the government. Accordingly, we simply adopt our earlier finding that the lack of an adequate warning was the proximate cause of Petty's injuries. *See supra* p. 1437–39.

Under Iowa law, Merrill-National would have been held strictly liable for its distribution of a defective product which proximately caused Petty's injuries. Accordingly, in addition to holding the government liable for its own negligence, we alternatively hold the United States derivatively liable for Merrill-National's liability under strict liability.[12] 42 U.S.C. § 247b(2)(A)(i).

BRIGHT, Circuit Judge, dissenting.

I dissent. I believe that the warning Petty received before being vaccinated was adequate. Therefore the United States is not liable under either the negligence theory or the strict liability theory propounded by the majority.

Even assuming that serum sickness was a foreseeable risk attending swine flu vaccination, I think vaccinees received adequate warning. The information form Petty read stated that, "[a]s with any vaccine or drug, the possibility of severe or potentially fatal reactions exists." I do not think that a more specific warning, either describing the symptoms of serum sickness or mentioning that condition by name, would have served any useful purpose in the context of this mass inoculation program. Vaccinees were warned that a small risk of severe or fatal reaction accompanied receiving the vaccine. The majority does not dispute the minimal nature of that risk, but maintains that the warning should have itemized the potential adverse reactions from the vaccine. Yet, the warning of the "possibility of severe or potentially fatal reactions" more directly, completely, and graphically describes for the lay person the hazards of receiving the vaccine than a specific itemization of adverse effects. I agree with the government and with most of the courts that have considered the issue, *see supra* n. 6, that a detailed catalogue of every serious complication that might befall a vaccinee would

---

**12.** We note that this holding does not defeat the congressional intent to immunize drug manufacturers from unlimited liability exposure. By virtue of the liability scheme presented in the Swine Flu Act the burden of both defending this action and the resulting damages is borne by the United States. *See* 42 U.S.C. § 247b(2)(A)(i);

*see also Unthank v. United States,* 732 F.2d 1517 (10th Cir.1984) (alternatively holding government derivately liable for manufacturer's strict liability based on congressional intent to assure compensation for all persons injured by the swine flu vaccination).

have been counterproductive, serving to confuse or needlessly alarm potential vaccinees without giving them any more information necessary to the making of an informed decision. I therefore reject the majority's conclusion that the failure to specify the potential adverse effects of the vaccine makes the warning inadequate when, as here, the warning aptly apprised vaccinees of the overall possibility of harm.

Because the warning was adequate, the government was not negligent. Nor is the government strictly liable under the theory that the unavoidably unsafe vaccine was rendered defective or unreasonably dangerous by the failure to give a more detailed warning.

I think the practical consequence of the court's decision is to impose so stringent a warning requirement as likely to render any future mass inoculation program infeasible, no matter how desirable.

Accordingly, I dissent.