Jack C. COOLEY, Appellee,

v.

QUICK SUPPLY COMPANY, an Iowa corporation, Appellant.

No. 2–56030.

Supreme Court of Iowa.

Sept. 18, 1974.

Rehearing Denied Oct. 10, 1974.

Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, for appellant.

Reynoldson, Brown & Van Werden, Osceola, for appellee.

LeGRAND, Justice.

This appeal had its origin in an accident which inflicted serious personal injuries to plaintiff when several sticks of dynamite he was holding exploded. Claiming a defect in the fuse used to ignite the dynamite, plaintiff seeks recovery from Quick Supply Company, wholesale distributor which supplied the fuse to the retailer from whom plaintiff ultimately bought it. A jury trial resulted in a verdict and judgment for plaintiff, which we affirm.

Plaintiff asserted a right of recovery based, first, on the doctrine of strict liability and, in a separate count, he asked damages because defendant was negligent in failing to provide adequate warning concerning the dangers attendant upon the use of the product.

To set the stage for our discussion, it is necessary to recount the circumstances very briefly. Other facts will be related as they bear upon the particular issues involved. Plaintiff and several friends, Steve Roberts and James Kilkenny, none of whom had any previous experience with dynamite, decided to use that explosive to kill undesirable fish which had been multiplying in a pond located on a farm plaintiff was working. Plaintiff purchased five sticks of dynamite, some dynamite caps, and approximately 10 or 12 feet of safety fuse, also referred to in the record as dynamite fuse, at Mateer Implement Company on the day of the accident.

Late in the afternoon the three went to the pond to try their experiment. They did this in the following manner. First they attached a dynamite stick to a board so it would not sink. They then affixed a blasting cap to the dynamite, inserted a 1½ or 2-foot length of fuse, and lit the fuse by means of a cigarette lighter. After the fuse was lit, the stick and attached board were tossed into the pond at the desired location. The resulting explosion was supposed to kill the unwanted fish.

This procedure was followed twice without incident, but with unsatisfactory results as to the kill. On the third try the men decided to double the charge. They tied two sticks of dynamite together and

repeated the pattern except that this time no float board was used. Plaintiff held the dynamite while one of the others lit the fuse. It exploded in his hand, causing severe, painful, and permanent injuries. We need not describe the extent of plaintiff's damages since the amount of the judgment is not an issue on this appeal.

In the strict liability count the only product defect submitted was the allegation that the fuse "did not appear to be ignited when in fact it was ignited"; and the sole negligence relied on in the ordinary tort count was defendant's failure to warn as to the safe and proper use of that product. No attack is made on either of the other two components—the dynamite itself or the dynamite caps—and our consideration is accordingly limited to the condition and use of the fuse.

Defendant's appeal presents five issues for review. We state them as defendant did although not in the same order. They are: (1) plaintiff should be barred from recovery because he voluntarily engaged in an extra hazardous activity which caused his injuries; (2) plaintiff's theory of liability is contrary to the laws of nature, is unsupported by expert testimony, and controverted by expert testimony; (3) the trial court improperly instructed the jury in a manner which permitted it to find defendant liable on both strict liability and ordinary negligence and to designate each as *the* proximate cause of plaintiff's injuries; (4) defendant wholesaler is not bound to observe an unreasonable standard of care which would require it to give suitable warnings to each retail purchaser concerning the propensities and dangers of safety fuses; and (5) plaintiff failed to show the fuse was in a defective condition at the time it left the hands of defendant wholesaler.

■ I. First we treat the argument plaintiff's claim is barred by "his conduct as an adult person of normal intelligence in engaging in an extra hazardous activity." Apparently this is intended to allege plaintiff was guilty of contributory negligence and had assumed the risk of injury, both as a matter of law. Although this issue is not framed in the usual language of those two affirmative defenses, both of them were pled and were submitted to the jury. We accordingly assume defendant is relying on them here.

The jury was instructed on assumption of risk in the strict liability claim and on contributory negligence in the other count. This was proper under Rosenau v. City of Estherville, 199 N.W.2d 125, 133 (Iowa 1972), and no objection is made to that method of submission. See also 63 Am.Jur. 2d Products Liability, § 150 (1972). Defendant's argument rather is that these questions should have been decided against plaintiff as matters of law.

■ We have said repeatedly questions of contributory negligence and assumption of risk are ordinarily for determination by the jury and should be decided as matters of law only in exceptional cases. Rule 344(f), (10), Rules of Civil Procedure; Bessman v. Harding, 176 N.W.2d 129, 130 (Iowa 1970). This is not one of those exceptional cases.

The detonation of dynamite sticks by means of dynamite caps and fuse is an accepted method of using this explosive for a multiplicity of purposes in industry, farming and other pursuits. Plaintiff's explanation for the alleged premature explosion is that the fuse was defective and did not give the customary indications of ignition, as had been the case with the two previous explosions, when plaintiff was warned the fuse was lit by the emission of smoke and a sputtering noise.

There was substantial testimony from which the jury could find plaintiff attached a 2-foot length of fuse to the final charge; that the retail salesman had told him—incorrectly—that it burned at the rate of one foot per minute; and that the fuse gave off no smoke, no odor, no noise before exploding. Whether plaintiff was negligent in failing to more quickly toss

away the dynamite sticks, and the related question whether it was contributory negligence in any event to hold the dynamite sticks while lighting them, were matters to be decided by the jury, not the court.

This is equally true of the assumption of risk issue. The elements of assumption of risk were discussed recently in King v. Barrett, 185 N.W.2d 210, 213 (Iowa 1971). We need not repeat them here. We hold plaintiff did not assume the risk of injury as a matter of law under this record.

■ II. We next dispose of the defendant's claim plaintiff should have been denied recovery because his legal theory was "contrary to the laws of nature, unsupported by expert testimony, and controverted by expert testimony." The issue thus raised is that the evidence is insufficient to sustain the verdict because the physical facts establish beyond doubt the incredibility of plaintiff's theory. See Howie v. Ryder & McGloughlin, 244 Iowa 861, 865, 58 N.W.2d 389, 391 (1953); Jacobson v. Camden, 236 Iowa 976, 980, 20 N.W.2d 407, 409 (1945); Scott v. Hansen, 228 Iowa 37, 41, 42, 289 N.W. 710, 713 (1940).

We consider this matter, of course, in the context in which the case reaches us. As already stated, the products liability count was submitted to the jury on the sole basis the safety fuse was defective because, when ignited, it did not give any of the usual appearances or warnings of being ignited. We should distinguish between *original ignition* and *later burning*, although the difference may at first appear to be without substance. It is the former upon which plaintiff relies; but it is the latter which defendant seems to argue so vigorously here. As we will demonstrate later, there is ample evidence to support plaintiff's claim the fuse ignited without any signs of ignition. Perhaps (although we do not so hold) defendant's argument about the physical facts rule has merit as far as the ultimate burning of the fuse is concerned. However, a finding that plaintiff's evidence dealing with the burning of the fuse was "contrary to the established physical facts" or was "inherently incredible," as we say in the cases cited, would not save defendant from its present dilemma.

Two experts testified. One, Ralph S. Hale, stated he was familiar with safety fuse, knew its composition, the method of its manufacture, and how it reacted when ignited. He testified it emitted smoke, caused an odor, and occasioned a sputtering or, as the witness described it, a "spit." He testified it was impossible for the fuse to be ignited without these three results, all of which, of course, would be readily apparent to the senses. Incidentally, plaintiff and several other witnesses testified unequivocally the explosion which caused plaintiff's injury occurred without these telltale warnings being present.

David Balboni also testified as an expert for defendant. He, too, was thoroughly familiar with dynamite and with the type of fuse used here. He corroborated generally the facts previously given by Mr. Hale, and parts of his testimony were even more helpful to defendant than that of Mr. Hale.

On the question of ignition of the fuse, however, we believe Mr. Balboni's testimony was extremely helpful to plaintiff. He said the ignition of the fuse might be "masked" if ignited under certain conditions. He testified the use of a cigarette lighter—the method used here—could produce that effect.

It is clear there is an important line to be drawn between the circumstances existing when the fuse ignited and those present during the subsequent burning of the fuse after ignition. As already pointed out, plaintiff alleges only a defect at the time of ignition, and on this point Mr. Balboni's testimony is vital.

We quote from his testimony:

"Q. What sign does it [the fuse] show of being ignited when you use that

"Q. method [lighting it by means of a match]?

"A. Well, there is the audible [sputtering], the visual [smoke], and the nasal [odor], I guess.

"Q. Can you light [this type of] fuse without it giving signs of it being lit?

"A. I'm not too sure of your question but for instance you could throw it into a fire and it might be lit and because of all the flame around it from the fire you might not know it was lit. It would be an unaccepted way to light, of course.

"Q. Have you observed [this type of] fuse being lit with a cigarette lighter?

"A. Well, I personally have tried it a few times just during our tests just to see the kind of difficulty you have if you don't use the proper technique for lighting fuse.

"Q. Would you tell the jury what happened when you do that?

"A. Well, what usually happens is that the fuse structure catches on fire so that you have like a fire ball on the end of the fuse. And you just —*you don't know whether the core is lit or not*. It is a pretty dangerous thing to do, I might add, unless you don't have any blasting cap hooked on to it.

"Q. How many burns have you seen of safety fuse?

"A. During my 10 year period of manufacturing, I probably—under my jurisdiction we manufactured in excess of a million and a half feet of safety fuse and I probably lit personally thousands of pieces and observed some thousands more in the test programs.

"Q. Are there any circumstances under which the ignition spit can be masked?

"A. Well, it can be disguised * * * if you put it into a fire or a torch. * * *

"Q. What about with the cigarette lighter?

"A. Can it be masked with a cigarette lighter?

"Q. Yes.

"A. In my opinion, yes.

"Q. And how is that?

"A. *Just by the fact you have all this flame from the lighter.* It is also difficult to light the end of a piece of fuse with just a match or with just a cigarette lighter because the asphalt coolings tend to smear over the end of the fuse. All of the accessory devices I mentioned that we sell are designed to put a jet of flame up against the column."

"Q. Mr. Balboni, have you ever burned fuse where the end of it has been fluffed up?

"A. Yes.

"Q. What happens to that fuse?

"A. It is difficult to light.

"Q. And if it does light what happens?

"A. A lot of times what will happen is that the waxes and the cottons will catch on fire *so that it masks whether the inside powder train is ignited or not.*

"Q. Can you tell the jury what would happen if the fuse were hanging down and the outside of the fuse were on fire?

"A. *In my opinion, it would be awfully hard to know if it was ignited unless you let it burn up a way into the length.*

"Q. What would happen if the cap were not properly crimped and the outside of the fuse were on fire?

"A. That's an extremely hazardous condition if the charge that the cap is inserted into has not been confined with stemming around it in the bore hole—*there have been many accidents over the years where an improperly crimped cap takes a spark and the cap detonates before the fuse train hits it.*" (Emphasis throughout supplied.)

This evidence, when considered with the testimony of plaintiff and several other witnesses that nothing alerted them to the fact the fuse had ignited, fully supports plaintiff's allegations regarding the defective fuse. It also permits a finding this would reduce the time within which plaintiff could have taken precautionary measures for his own safety before the explosion took place. The jury was justified, therefore, in holding defendant liable for this defect even if the burning itself (as distinguished from ignition) was faultless.

There is still another reason the "physical facts" argument must fail. The record discloses no basis for its application. The testimony upon which defendant seeks to rely did not purport to set out any immutable laws of nature which would make that rule available here. Each expert witness merely stated his own view as to the characteristics of the safety fuse, and the jury was entitled to consider this testimony as it was given—the opinion of the expert witness who expressed it.

■ We mention in passing that our conclusion is buttressed by the fact the defendant in its brief attempts to present a considerable mass of factual information which was not introduced at the trial. This includes numerous references to scientific journals, a detailed description of the chemical components of black powder and an equation designed to show what happens when black powder such as that used in this fuse burns. Most of this could

have been introduced as evidence through the expert witness. The fact it was not suggests defendant did not then rely on the theory it now espouses. In any event, we cannot consider such matter when it is raised for the first time on appeal.

The record shows this safety fuse has a number of built-in factors which protect the user. These include a slow burning rate (one foot in 40 seconds) and the indicia that burning has begun—smell, smoke, and sputtering. If the onset of burning cannot be recognized because ignition is "masked," the warning time is reduced and the user, particularly the inexperienced one, is imperiled. Is defendant liable for placing such a product in the hands of the general public without suitable warning or instruction as to its safe use? Does this present a danger "not contemplated by the ultimate consumer," as discussed in § 402A, comments "g" and "j", Restatement, Torts 2d (1965)?

We believe these were questions for jury determination under proper instructions as to assumption of risk.

The case of Canifax v. Hercules Powder Co. (1965), 237 Cal.App.2d 44, 46 Cal.Rptr. 552, 557, 558 said this in discussing a related problem:

"'Comment g' of the Restatement [§ 402A] points out that the rule applies only where the product is defective, but the word 'defective' is given a somewhat broad definition. The comment says: 'The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, *in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.*' (Emphasis supplied.) In 'Comment j' it is declared: 'In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use.' * * *

"We think it is a fair summarization of the foregoing comments to say that it is the opinion of the Law Institute that a

product, although faultlessly made, may nevertheless be deemed 'defective' under the rule and subject the supplier thereof to strict liability if it is unreasonably dangerous to place the product in the hands of a user without a suitable warning and the product is supplied and no warning is given."

Similar language appears in Hall v. E. I. Du Pont De Nemours & Co. (E.D.N.Y. 1972), 345 F.Supp. 353, 360, from which we quote:

"Under both negligence and strict liability standards manufacturers and other suppliers have a duty to users, consumers, and in some circumstances to the general public or portions of it, to produce products with appropriate warnings, instructions, and other safety features. *See, e. g.,* Noel, Manufacturer's Negligence of Design or Directions for Use of a Product, 71 Yale L.J. 816 (1962); Noel, Products Defective Because of Inadequate Directions or Warnings, 23 Sw.L.J. 256 (1969); Rest.2d Torts § 388, comment e, § 402A, comments j, 1 (1965) (warnings under negligence and strict liability standards). * * *

"A manufacturer's duty to produce a safe product, with appropriate warnings and instructions where necessary, rests initially on the responsibility each of us bears to exercise care to avoid unreasonable risks of harm to others. *See, e. g.,* 2 Harper & James, The Law of Torts § 28.3 (1956). An 'unreasonable risk' in any given situation depends on the balancing of probability and seriousness of harm if care is not exercised against the costs of taking precautions. *See, e. g.,* United States v. Carroll Towing Co., 159 F.2d 169, 173 (2d Cir. 1947); 2 Harper & James, supra, §§ 16.9, 28.4; Rest.2d Torts §§ 291–293, 298 (1965).

"Activity involving a small likelihood of death or serious injury may require greater and more costly precautions than that involving a higher probability of lesser harm. *See, e. g.,* The Glendola, 47 F.2d 206, 207 (2d Cir. 1931), cert. denied, 283 U.S. 857, 51 S.Ct. 650, 75 L.Ed. 1463 (1931); Rest.2d Torts § 388, comment n at 309 (1965); 2 Harper & James, The Law of Torts § 16.9 at 931–32 (1956). Where an act involves: a risk of death or serious bodily harm, and particularly if it is capable of causing such results to a number of persons, the highest attention and caution are required even if the act has a very considerable utility. Thus those who deal with firearms, explosives, poisonous drugs, or high tension electricity are required to exercise the closest attention and the most careful precautions, not only in preparing for their use but in using them. Rest.2d Torts § 298, comment b at 69 (1965)."

The question of warning is discussed more fully in Division IV. For the moment we say only that there was sufficient evidence of defective safety fuse to take the case to the jury under § 402A, Restatement, Torts, Second (1965), which we adopted in Hawkeye-Security Insurance Co. v. Ford Motor Co., 174 N.W.2d 672, 684 (Iowa 1970). See also 56 Iowa L.Rev. 707 (1971).

■ III. Defendant next asserts reversible error occurred because the jury was instructed it must find (in the strict liability count) the defective fuse was the proximate cause of the accident and was also told (in the ordinary tort count) the negligence of defendant must be the proximate cause of the accident. Defendant says *both* cannot be *the* proximate cause. The trial court, it says, should have charged the jury that each could be *a* proximate cause but not *the* proximate cause.

Perhaps this oversimplifies defendant's objection. It also claims the two bases for recovery are inconsistent with each other, arguing the jury could not find each was the proximate cause of the accident without contradicting itself. Defendant relies upon the case of Stanbery v. Johnson, 218

Iowa 160, 166, 254 N.W. 303, 306 (1934) as authority, but we do not find support there for defendant's view. That was an automobile guest claim which turned on the conflicting assertions by plaintiff, who necessarily said defendant was reckless, and defendant, who insisted he was at most only ordinarily negligent. Two interrogatories were submitted and the jury answered both affirmatively—one said defendant's negligence was the proximate cause; the other that his recklessness was the proximate cause. Under those facts, the answers *were* in conflict. One answer relieved defendant of liability; the other fixed his responsibility. But there is no such conflict here. Defendant could be liable both under the doctrine of strict liability and also by reason of its negligence.

We do not believe, as defendant claims, the *Stanbery* case announced a rule there can be only one proximate cause for an event. We have held otherwise many times. See Andrews v. Struble, 178 N.W. 2d 391, 398 (Iowa 1970).

In the case before us, the jury's verdict that defendant was liable on both theories asserted by plaintiff is fully justified by Hawkeye-Security Insurance Co. v. Ford Motor Co., supra, 174 N.W.2d at 685; Restatement, Second, Torts, (1965), § 402A, comment "a". See also Canifax v. Hercules Powder Co., supra, 46 Cal.Rptr. at 559.

Under this record, reference in the instructions to each of two acts as "the" proximate cause instead of "a" proximate cause was not error, particularly since defendant resisted plaintiff's effort to have the trial court adopt the form for which it now argues. Cf. Gunnison v. Torrey, 216 N.W.2d 361, 365 (Iowa 1974).

IV. We consider now defendant's duty to warn plaintiff concerning use of the safety fuse. This issue applies to plaintiff's claim based on negligence.

We recently discussed this matter in West v. Broderick & Bascom Rope Company, 197 N.W.2d 202, 208–212 (Iowa 1972),

where we approved this rule announced in § 388, Restatement (Second) of Torts (1965):

"One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

Defendant advances two propositions concerning this issue: (1) There was no duty to warn because the safety fuse posed no danger to the user; and (2) if it had a duty to warn, that obligation was fulfilled by warning literature enclosed with the fuse delivered by defendant to Mateer Implement Company.

Concerning the first argument, we refer again to West v. Broderick & Bascom Rope Company, supra, 197 N.W.2d at 209, where the same argument was made as to a wire rope sling which broke and caused injury to a workman. We met that argument by pointing out the product might present certain risks when put to use although "hanging in the warehouse, it was not dangerous."

Here defendant's insistence the fuse was not dangerous and "could not explode" disregards the only purpose for which it was sold to plaintiff. Of course, it endangers

no one while still in the box as part of a 50-foot roll; but it is sold to be used as a trigger for detonating dynamite, a highly dangerous substance. Potential danger and the accompanying duty to warn must be judged in this context, not as though the fuse was something to be sold and used by itself.

■ This brings us to the second part of defendant's argument—that the literature furnished Mateer Implement Company relieved it of further obligation to warn. We recite the facts upon which this depends.

As already stated, the safety fuse was sold to Mateer Implement Company in 50-foot rolls. A number of rolls were included in a single large carton. Each carton contained a written warning which, among other things, referred to instructions on the use of dynamite set out in a separate pamphlet which was furnished with each shipment of dynamite. No measures were taken to get such warnings to the ultimate users of the safety fuse; nor was any inquiry made to ascertain if Mateer's practice was to furnish such information to each purchaser.

The evidence shows numerous sales of fuse were in lengths less than 50 feet and that it was sold to all who requested it. The only purpose for which it was bought was to explode dynamite. Defendant must have foreseen some purchasers would be unfamiliar with the use of dynamite and ignorant of the proper manner to use the safety fuse. It must have foreseen, too, the probability of injury if it were used improperly.

■ The duty to warn is not absolute. Whether a warning is required, and to whom it must be given, are questions to be decided by standards of reasonable care.

In Doss v. Apache Powder Company, 430 F.2d 1317, 1321 (5th Cir. 1970), the court said:

"In some circumstances a warning by the manufacturer to a supplier may be suffi-cient to discharge the duty to inform those for whose use the article is intended. * * * On the other hand, it may not be sufficient to warn the dealer if the article is highly dangerous, or the manufacturer has knowledge that the dealer is not careful in the conduct of his business, or the manufacturer has no knowledge of the likelihood whether the dealer will pass on the warning. Restatement § 388 comment "n" at 309–310."

In Eck v. E. I. Du Pont De Nemours & Co., 393 F.2d 197, 201 (7th Cir. 1968), this statement appears:

"Clearly Du Pont's defense rests in part upon whether the minimum safe distance outlined in its 'Field Clearing Pamphlet' was made known to plaintiff's foreman, and through him its duty to plaintiff was discharged. We hold that the question of whether the failure of defendant to establish that such notice was given to plaintiff either personally or vicariously, raised an issue of fact which the court should have submitted to the jury."

The same principle is approved in West v. Broderick & Bascom Rope Company, supra, 197 N.W.2d at 211, 212, where we said:

" * * * '[G]iving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. * * * *The question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it.'* (Italics added.) * * *

"Whether reasonable care requires warning beyond the manufacturer's immediate vendee in a particular case depends upon various factors. * * * Among them are the likelihood or unlikelihood that harm will occur if the vendee does not pass on the warning to the ultimate user, the trivial or substantial nature of the probable harm, the probability or im-

probability that the particular vendee will pass on the warning, and the ease or burden of the giving of warning by the manufacturer to the ultimate user.

\*    \*    \*    \*    \*    \*

"Cases may arise in which the factors are such that a court may rule as a matter of law the giving of warning to a manufacturer's vendee alone is, or is not, due care. This is not such a case. The trial court properly let the jury say whether reasonable care required that a warning of rated capacity be given to the ultimate users. \* \* \*"

Under the authorities cited, the question of defendant's duty to warn was clearly a jury question, and the trial court properly submitted the issue for their determination.

Defendant complains that it would be burdensome, if not impossible, to give notice to each ultimate user of the product. Difficulty of giving notice is only one of the factors to be considered in deciding this question. We see no reason why defendant could not take measures to get a warning to those who need it. The law demands only that the method used give "reasonable assurance that the information will reach those whose safety depends upon their having it." Defendant made no attempt to satisfy that rule.

■ One other matter deserves brief mention in this division. Defendant says there was no duty to warn because it could not foresee plaintiff would use the fuse in an unintended manner. See 63 Am.Jur.2d Products Liability § 136 (1972).

We cannot agree this is true as a matter of law. Plaintiff was using the fuse for its intended purpose—the detonation of dynamite. Whether his conduct was so foolhardy as to bar recovery was considered and rejected by the jury in passing on the defense of contributory negligence. Defendant cannot relieve itself of a duty to warn by assuming every user of its product will act with judgment and caution.

V. The last complaint asserts there is no showing the fuse was defective when it left defendant's hands.

■ Plaintiff, of course, must prove both the existence of a defect and the existence of that defect when the product left defendant's possession. Such proof need not be by direct testimony. More frequently than not it is established by circumstantial evidence. Kleve v. General Motors Corporation, 210 N.W.2d 568, 571 (Iowa 1973); Hawkeye-Security Insurance Co. v. Ford Motor Co., supra, 174 N.W.2d at 678.

Much of what we said in Division II is applicable here too. The defect relied on by plaintiff is broad enough to include not only a fuse which *actually* failed to give off signs it was ignited, but also one which *seemed* to do so because the signs, even if present, were concealed.

In Division II we decided a jury question had been made out on the issue of product defect. Here we consider only if there is evidence from which the jury could find that defect was shown to have existed when defendant sold the fuse to Mateer.

We previously discussed the conditions which justified a finding the safety fuse was defective—conditions which actually made it a non-safety fuse by masking or concealing from plaintiff the fact it was lit and was inexorably burning its way toward an explosion earlier than he could rightly expect.

■ The second necessary finding—that the condition existed when it left defendant's possession—follows almost inevitably from the first. Defendant's expert testimony shows these characteristics of a burning fuse are part of the manufacturing process, put there designedly when the fuse is made. The jury could hardly have reached any conclusion except that the fuse, when used, was in the same condition as when sold by defendant.

Under this record we deem the fact that the fuse was used some eleven months after defendant disposed of it by sale to Mateer is of no importance. Not only is the fuse a product which is virtually tamper-

free under any circumstances, but the testimony of the expert witness Balboni established the very properties which made it dangerous are present in all such fuse from manufacture to ultimate use. Cf. Kleve v. General Motors Corporation, supra, 210 N.W.2d at 572 and dissent at 575, 576.

There was abundant evidence from which the jury could find the conditions making this fuse defective for its intended use existed at the time defendant sold it to Mateer Implement Company.

VI. Finding no reversible error in any of the issues raised, we affirm the judgment of the trial court.

Affirmed.

All Justices concur, except REYNOLD-SON, J., who takes no part.