**Darlene A. BRAZZELL, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. C 80–4084.**

United States District Court, N.D. Iowa, W.D.

April 4, 1985.

Mayer Kanter, Wilford Forker, Sioux City, Iowa, for plaintiff.

Robert L. Teig, Asst. U.S. Atty., Cedar Rapids, Iowa, for defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

DONALD E. O'BRIEN, Chief Judge.

This matter comes before the Court after a court trial. This is an action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.*, in conjunction with the National Swine Flu Immunization Act of 1976, 42 U.S.C. §§ 247b(j)–(*l*) for injuries sustained by plaintiff as a result of her swine flu vaccination. Jurisdiction is based upon 28 U.S.C. § 1346(b). This action was transferred shortly after filing to the District of Columbia for coordinated pretrial proceedings. Upon completion of those proceedings, the case was remanded to this district for trial. The plaintiffs originally pleaded several theories. The Court concludes that plaintiffs are liable under the theory of strict liability and expresses no opinion as

to whether defendant could be held liable under some other theory based upon the facts here. After fully considering this matter, the Court finds in favor of plaintiff and enters judgment in the amount of $33,482.29 with interest and costs of this action as provided by law.

Darlene Brazzell went to the office of her family physician, Dr. Spellman, signed a "registration form" and received a swine flu shot from a nurse. She did not see the doctor that day.

At Dr. Spellman's office she was given a form headed "Important Information from the U.S. Public Health Service about Swine Flu and Victoria Flu Vaccines" (Def't Exh. F). The form contained the following statements:

> These vaccines have been field tested and shown to produce very few side effects. Some people who received the vaccine had fever and soreness during the first day or two after vaccination. These tests and past experience with other flu vaccines indicate that anything more severe than this would be highly unlikely.
>
> \*   \*   \*   \*   \*   \*
>
> *Possible Vaccine Side Effects.* Most people will have no side effects from the vaccine. However, tenderness at the cite of the shot may occur and last for several days. Some people will also have fever, chills, headache or muscle ache within the first 48 hours.
>
> *Special Precautions.* As with any vaccine or drug, the possibility of severe or fatal reactions exists. However, flu vaccine has rarely been associated with severe or fatal reactions.

This tort action follows an earlier case, *Petty v. United States,* 536 F.Supp. 860 (N.D.Iowa 1980), rev'd 679 F.2d 719 (8th Cir.1982), on remand 592 F.Supp 687 (1983), aff'd 740 F.2d 1428; in which the Eighth Circuit Court of Appeals affirmed this Court's damages award for injuries suffered by another recipient of the swine flu vaccination. The conclusions of law reached here are consistent with the conclusions reached in *Petty.*

## INTRODUCTION [1]

The Swine Flu Act of 1976 was an attempt by the Federal Government to inoculate the entire adult population of the United States against the threat of a swine flu epidemic. It was the largest immunization program in this country's history, and over 45 million Americans—or one-third of the adult population—were vaccinated. The initial vaccination was on October 1, 1976, and the program was suspended on December 16, 1976. The program, for which $135 million was initially appropriated by Congress, called for using both private and public health care systems to achieve its goal of inoculating the entire adult population by the end of November 1976. The November deadline was critical since the season of intense flu transmission in the United States is generally considered to be September through March.

The Swine Flu Act became law on August 12, 1976 and was applicable to all swine flu inoculations administered after September 30, 1976. Important provisions of the Act include the following:

1. The Act creates a cause of action against the United States for any personal injury or wrongful death sustained as a result of the swine flu inoculation resulting from the act or omission of a program participant upon any theory of liability that would govern in an action against such program participant including negligence, strict liability in tort, and breach of warranty; [former] 42 U.S.C. § 247b(k)(2)(A); [2]

---

1. This introduction is taken from *Bean v. United States,* 533 F.Supp. 567 (D.C.Colo.1980). The Court is using this introduction because it believes it is a clear, concise statement of the situation necessary for a full understanding of this matter. Certain authorities and footnotes from Bean have been omitted here.

2. The Multidistrict Court held that nothing in the Swine Flu Act itself bars a plaintiff from demonstrating that the United States had a duty to warn vaccinees.

2. It makes that cause of action the exclusive remedy ( [former] 42 U.S.C. § 247b(k)(3)) and abolishes the cause of action against the vaccine manufacturer; and

3. It makes the procedures of the Federal Tort Claims Act applicable to suits brought pursuant to the Swine Flu Act ([former] 42 U.S.C. § 247b(k)).

The program was prompted in part by the medical discovery in early February 1976 at Fort Dix, New Jersey, of military servicemen having a new strain of influenza virus antigenically related to the virus prevalent during the 1918–19 swine flu pandemic. That pandemic was responsible for 20 million deaths worldwide, including 500,000 in the United States alone. Prior to 1930, this strain was the predominant cause of influenza in the United States. Since 1930, the virus had been limited to transmission among swine only with occasional transmission from swine to human, with no secondary person-to-person transmission.

In addition, the Swine Flu Act was prompted by the collapse of the commercial liability insurance market, both for vaccine manufacturers and other program participants. The cases of *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121 (9th Cir.1968), and *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir.1974), which held a manufacturer of polio vaccine strictly liable in tort, greatly contributed to the insurance problem. For this reason, the Swine Flu Act provided that the exclusive remedy for injury caused by the vaccine would be against the United States. However, since the manufacturers could still insure themselves against negligence liability, they may be liable in a suit by the United States (former 42 U.S.C. § 247b(k)(7)) if the United States is found to be liable on a negligence theory.

History has demonstrated that no swine flu epidemic occurred during the winter of 1976–77. As can be expected, however, many people who were inoculated also incurred some type of illness, injury or adverse medical condition in a period relative to the vaccination. Lawsuits, such as the instant one, were filed throughout the country for illnesses allegedly resulting from the immunization. In addition, numerous administrative claims have been filed.

### FINDINGS OF FACT [3]

1. Plaintiff, Darlene Brazzell was born September 9, 1918. At the time of the incident out of which this suit arises, she was 58 years old.

2. Plaintiff received a bi-valent swine flu vaccination on November 11, 1976, at the office of her family doctor, Dr. Spellman. It was administered by Dr. Spellman's nurse, and plaintiff did not see the doctor the day the shot was given. Dr. Spellman was a program participant under the National Swine Flu Act. (Spellman, p. 25). Dr. Spellman had previously recommended that she receive the vaccination when plaintiff was in his office for purposes of receiving a regular flu vaccination. She had a history of health problems, including tuberculosis, which placed her in a potential high-risk group in the event she contracted swine flu. Plaintiff testified that she, on the advice of her physician, had to wait six weeks after receiving her regular flu shot before receiving the swine flu shot, and that she did, in fact, wait at least six weeks.

3. The government conducted an extensive media campaign to promote the influenza vaccine. The Department of Health, Education and Welfare (HEW) spent approximately $376,000 for educational and promotional activities which included mass media, newspapers, radio and television, slide services, films, posters, car çards, direct mail and newsletters. State and local health departments spent additional, but unknown, sums for promotion. *See In re Swine Flu Immunication Products Liability Litigation*, Exh. 3,

---

3. At the outset the Court believes it is important to note this is not a Guillain-Barre Syndrome (GBS) case. In GBS cases, the Government admitted liability if causation could be shown.

FPTO, p. 4, MDL.[4] In one news release issued by the HEW on September 30, 1976, Assistant Secretary of Health, Dr. Theodore Cooper, was quoted as saying, "This is the safest and most effective vaccine ever produced against influenza and certainly is the most thoroughly tested." (Plaintiff's Exh. 24, p. 3). He further stated, "We recommend that *all* persons over age 18 take the vaccine. Citizens who are over 65 or who have chronic diseases such as emphysema and other lung diseases, ... should take a combination shot containing swine influenza and A/Victoria vaccines." (Plaintiff's Exh. 24, p. 2) (emphasis supplied).

4. There was considerable dispute as to whether the vaccination program should go forward in the manner proposed by the Ford Administration and whether the threat of an epidemic was real. (*Compare, e.g.,* Exh. 39, p. 23, Dr. Russell Alexander stating, "I thought it [an epidemic] was pretty much impossible that season"; and Exh. 24, p. 1, a news release issued by the HEW, September 30, 1976, quoting former HEW Secretary David Mathews, "Our scientists told us that the finding of this virus in an outbreak at Ft. Dix last February, may be an early warning of a coming flu epidemic.").

5. Dr. Albert Sabin testified, "ninety percent or more of those 52 years of age or over had already enough immunity, as measured by antibodies in the blood, than could be produced by the vaccine." (Plaintiff's Exh. 76, p. 60). Thus, ninety percent or more over age 52 already had protection. (Plaintiff's Exh. 76, p. 63; *see also* Exh. 77, Dr. Jonas Salk, p. 106). The government's publicity conveyed the impression that it was necessary that everyone be vaccinated to help prevent an epidemic, but this misinformed the public, particularly those persons (such as plaintiff) over age 52. (Plaintiff's Exh. 76, p. 63, 82). There is no evidence that plaintiff was ever told there was a ninety percent likelihood that she was already immune.

6. Dr. Sabin disputed whether the vaccine was adequately protective because 19 to 20 percent who received it suffered severe reactions based upon high fever and an illness with headache and malaise which lasted for one to two days after vaccination.

7. Prior to her doctor's appointment to receive the swine flu shot, plaintiff read newspapers and magazines that said there was a strong possibility of a swine flu epidemic. Plaintiff also saw President Ford on television, supposedly getting the first shot in the government's immunization program (partial transcript of proceedings, pp. 24–25, 77–78). In light of her prior health problems, plaintiff believed that taking the flu shot was the "lesser of two evils" (partial transcript of proceedings, p. 25).

8. At Dr. Spellman's office plaintiff was given a form entitled "Important Information from the U.S. Public Health Service about Swine Flu and Victoria Flu Vaccines" (defendant's exhibit F, also identified as MDL Document 564), and a second form entitled "Registration Form" (defendant's exhibit E). The appropriate blanks on the Registration Form were filled in with plaintiff's name and address and plaintiff signed and dated the form November 11, 1976. The Court finds that these "consent forms" did not provide the plaintiff with sufficient information to enable her to make an "informed consent."

9. On November 15, 1976, four days after receiving the shot, plaintiff called Dr. Spellman complaining of chills and a slight fever since taking the shot (deposition of Dr. Spellman, p. 5). Dr. Spellman advised aspirin or Tylenol after meals and at bedtime. On November 19, 1976, she again called Dr. Spellman complaining of leg aches, fever, and hot and cold spells. Dr. Spellman prescribed Equanil, which is a muscle relaxant, and advised that she take hot tub baths.

10. On November 21, 1976, plaintiff again called Dr. Spellman complaining that she felt badly, and Dr. Spellman admitted

---

4. FPTO = Final Pretrial Order. MDL = Multi-      district Litigation.

her to a hospital. Plaintiff was experiencing muscle soreness throughout her whole body. The muscle soreness was referred to as myalgia.[5] She also experienced feelings of tenseness. Her anxiety was caused by feeling so badly and not getting any better (Tr. 28). Plaintiff was not discharged from the hospital until 8 December, 1976 (Dr. Spellman, p. 6).

11. Dr. Spellman saw her again on December 22, 1976, and January 5, 1977. While plaintiff was doing better on these dates, she still suffered much discomfort. On January 5, 1977, plaintiff informed Dr. Spellman that she felt that her illness was a result of the swine flu shot. He testified that any medical problems plaintiff had after August 29, 1978 would, in his opinion, be unrelated to the flu shot (Tr. 17). The myalgia suffered by the plaintiff was foreseen in the warning, Exhibit F. The difference was that it continued much longer (Spellman, Tr. 27).

12. Plaintiff became extremely nervous, at least in part about the pain, and saw psychiatrist, Dr. Gerald A. Brooks. Dr. Brooks hospitalized her from 16 April, 1977, until 25 May, 1977. Plaintiff was still under his care at the time the trial deposition of Dr. Brooks was taken November 4, 1981, over four years later.

13. Based upon his experience as a medical doctor specializing in internal medicine, and his examination and treatment of plaintiff, Dr. Spellman determined, with reasonable medical certainty, that plaintiff's illness was caused by a reaction to the swine flu vaccination. Dr. Spellman made this determination only in retrospect, three (3) to four (4) years after plaintiff

received the flu shot (Dr. Spellman, pp. 8–9). While plaintiff could have speculated as to the cause of her illness, as a lay person, she could not have discovered that her illness was caused by the vaccination until her family physician made that determination and so informed her.

14. Dr. Brooks, plaintiff's personal psychiatrist, found that the physical stress that plaintiff underwent as a result of the myalgia was a direct, contributing factor to her subsequent emotional problems (Dr. Brooks, p. 6). Dr. Brooks testified that plaintiff suffered from anxiety neurosis (Dr. Brooks, p. 15). Plaintiff felt depressed and anxious and had suicidal thoughts (Dr. Brooks, p. 4). The government's experts, Drs. Hansen and Penningroth, testified that plaintiff's emotional problems were more severe than anxiety and that she suffered from a major depressive disorder (Dr. Hansen, p. 6; Dr. Penningroth, p. 6).

15. The Court gave more credence to the testimony of the two attending doctors mentioned above than to the two physicians, Dr. Hansen and Dr. Penningroth who reviewed plaintiffs records and submitted opinions. Of these two physicians, only Dr. Penningroth actually saw plaintiff.[6]

16. The defendant had a duty to warn the plaintiff and the warnings given were insufficient and vague and did not provide an adequate basis for plaintiff to make an intelligent informed consent. The fact that Dr. Spellman was a "learned intermediary" does not relieve the government of the duty to warn under the circumstances here. This was particularly true in plaintiff's

---

5. Myalgia is defined as pain in the muscles. Dr. Spellman diagnosed her as having myositis and fascitis. The government doctor, Penningroth, did not seriously dispute this, but contended such a diagnosis could not be made without a biopsy.

6. Dr. Thomas W. Hansen, a psychiatrist, reviewed the plaintiff's medical records, but performed no personal examination of the plaintiff. Based upon his review of the records, in his mind, Dr. Hansen concluded that the swine flu vaccination and plaintiff's muscle soreness were initially linked (Dr. Hansen, p. 27). He

could not say with certainty whether the persisting myalgia was or was not linked. Dr. Hansen also believes that plaintiff's myalgia and emotional problems were not associated, but that her emotional problems arose from other personal ordeals.

Dr. Paul Penningroth, a psychiatrist and associate of Dr. Hansen, performed a personal examination of plaintiff and reviewed plaintiff's medical records. Based upon his examination and review of plaintiff's records, Dr. Penningroth concluded that plaintiff's myalgia and emotional problems were not associated.

case because the noted physician, Dr. Sabin, said that 90% of people in plaintiff's age bracket had sufficient antibodies in the blood to make them immune from swine flu. (See Finding of Fact No. 5). Further had the plaintiff been adequately warned she would have been enabled to make a more informed judgment.[7]

17. The resulting failure to warn was the proximate cause of the plaintiff's injury.

18. Plaintiff reasonably discovered the cause of her illness no earlier than November 11, 1979, when Dr. Spellman first made that determination and thereafter informed the plaintiff (Tr. 8–9).

19. Based upon all of the evidence, the Court concludes that plaintiff's physical illness described above was caused by the swine flu vaccination. However, the plaintiff had pre-existing emotional problems caused by anxieties she experienced in her personal life. These pre-existing problems were severely aggravated by the pain and stress of plaintiff's swine flu illness. The Court concludes that the pain and stress of plaintiff's physical illness were material elements and substantial factors in aggravating plaintiff's emotional problems.[7A] In so concluding, the Court gives significant credence to the testimony of plaintiff's personal psychiatrist, Dr. Brooks, who spent a greater amount of time examining and working with plaintiff than any other psychiatrist who testified, bolstered by the concurrent opinion of Dr. Spellman (Tr. 28).

20. At the time of trial, while plaintiff's myalgia had improved, plaintiff continued to suffer some symptoms. As a result of the illness caused by the vaccine, plaintiff has not led as active a life as she once did.

## CONCLUSIONS OF LAW

The Court has jurisdiction over the parties and the subject matter.

Iowa law applies as to any liability of the United States. *Petty v. United States*, 679 F.2d 719, 727 (8th Cir.1982). Federal law applies to determine whether plaintiff has complied with the applicable statute of limitations.. *Snyder v. United States*, 717 F.2d 1193 (8th Cir.1983).

In order to secure participation of the manufacturers and distributors of the swine flu vaccine and the cooperation of public and private agencies to administer the vaccine under the National Swine Flu Immunization Program Act, former 42 U.S.C. §§ 247b(j)–247b(*l*) (1976), Congress provided for the assertion of all personal injury or wrongful death claims directly against the United States. Former 42 U.S.C. § 247b(k)(1)(B). The Act directed that claimants follow the procedures for the Federal Tort Claims Act (FTCA), and specified that:

[T]he United States shall be liable with respect to claims submitted after September 30, 1976 for personal injury or death arising out of the administration of swine flu vaccine under the swine flu program and based upon the act or omission of a program participant in the same manner and to the same extent as the United States would be liable in any other action brought against it under such section 1346(b) and chapter 171, except that—

(i) the liability of the United States arising out of the act or omission of a program participant may be based on any theory of liability that would govern an action against such program participant under the law of the place where the act or omission occurred, including negligence, strict liability in tort, and breach of warranty;

(ii) the exceptions specified in section 2680(a) of title 28, shall not apply in an

---

**7.** Persons with chronic medical problems, such as plaintiff, were particularly encouraged to take the vaccination (Deft. Exh. F; Pltf. Exh. 24, p. 3). While these persons were given additional encouragement to take the vaccine, the information provided these persons with reference to the risk they were undertaking was the same and therefore equally as vague as that given others. For a detailed discussion of informed consent, see *Petty v. United States*, 536 F.Supp. 860, 864–70 (N.D.Iowa 1980).

**7A.** Prosser, Law of Torts § 41, p. 240 (4th ed. 1971).

action based upon the act or omission of a program participant; and

(iii) notwithstanding section 2401(b) of title 28, if a civil action or proceeding for personal injury or death arising out of the administration of swine flu vaccine under the swine flu program is brought within two years of the date of the administration of such vaccine and is dismissed because the plaintiff in such action or proceeding did not file an administrative claim with respect to such injury or death as required by such chapter 171, the plaintiff in such action or proceeding shall have 30 days from the date of such dismissal or two years from the date the claim arose, whichever is later, in which to file such administrative claim.

*Id. Petty v. United States,* 679 F.2d 719 (8th Cir.1982).

While the FTCA makes the United States liable only for the "negligent or wrongful act or omission of any employee of the Government acting within the scope of his office or employment ...", 28 U.S.C. § 1346(b), under former 42 U.S.C. § 247b(k)(1)(B)i, the law of the place where the vaccination was given applies and, unlike the FTCA, the United States may be found liable under negligence, strict liability in tort, and breach of warranty under the Swine Flu Act.

## I. Statute of Limitations

The government first contends that plaintiff's claim is barred by the statute of limitations.

In order for the plaintiff's claim to have been timely, it must have been filed "within two years after such claim accrues." 28 U.S.C. § 2401(b).

The government argues that a claim generally accrues at the time of the injury when the injury coincides with the causative act, *citing Wollman v. Gross,* 637 F.2d 544, 547 (8th Cir.1980), and that here, plaintiff received the swine flu vaccination on November 11, 1976, and the evening of November 11, 1976, she developed her first symptoms. While in the hospital in November of 1976, the doctor diagnosed her condition as myalgia, *probably* secondary to the swine flu shot, and conveyed that diagnosis to plaintiff.

Generally, for claims of this type, the claim "accrues" when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts or omissions constituting the basis of the cause of action. *Hulver v. United States,* 562 F.2d 1132, 1134 (8th Cir.1977); *Reilly v. United States,* 513 F.2d 147, 148 (8th Cir.1975). Once the plaintiff discovered the negligent act that caused her injury, she was under a duty to exercise reasonable diligence in bringing suit. *Reilly, supra,* at 149.

In this case, plaintiff was painfully aware in November, 1976 of the muscle soreness from which she suffered following the flu shot. In November 1976, plaintiff's physician told her that the pain from which she suffered was probably due to the swine flu vaccine. In January 1977, when plaintiff again complained of soreness, plaintiff's physician told her that her pain was not due to the swine flu shot. (Dr. Spellman p. 34). At this point, plaintiff could only speculate as to the cause of her illness; and she apparently did speculate that the swine flu vaccine was the cause. Plaintiff had no medical training, and no one else with medical training backed up her speculation. In short, her speculation was just that—speculation.

█ Plaintiff could not reasonably have discovered the acts upon which her cause of action is based until her doctor made the determination that her illness was caused by the swine flu vaccination, to a reasonable medical certainty; that determination was made by Dr. Spellman some three to four years after the swine flu shot was given. (Dr. Spellman p. 8–9). Thus, that determination was made no earlier than November 11, 1979.

In *Portis v. United States,* 483 F.2d 670 (4th Cir.1973), the Fourth Circuit faced a statute of limitations issue similar to that which this Court is faced with. In that case, Colonel James Portis sued as next

friend of his daughter for medical malpractice which allegedly resulted in his daughter's deafness. In reversing the dismissal of that case on the basis it was time barred, the Court of Appeals found it significant that even though Colonel Portis knew there was a "distinct possibility" of a causal relationship, neither doctor nor layman diagnosed the daughter's hearing difficulty as being caused, or even probably caused, by malpractice until six years after the fact. *Id.* at 673.

Thus, mere speculation by plaintiff as to the cause of her myalgia was not enough to start the running of the statute of limitations here. *Portis v. United States, supra*, 483 F.2d, at 673; *see Burgess v. United States*, 744 F.2d 771, 773–74 n. 5 (11th Cir.1984). The earliest date plaintiff might reasonably have discovered the cause of her illness was November 11, 1979, three years after the shot was given, which was the earliest date plaintiff's family physician would have made that determination. Consequently, the Court concludes that her claim did not accrue until November 11, 1979. Plaintiff filed her administrative claim on February 8, 1980, well within the two-year statute of limitations period.

## II. Strict Liability Theory

The plaintiff may be awarded complete relief under Iowa law pursuant to concepts of strict liability in tort. Thus, the Court need not address plaintiff's negligence theory, and expresses no opinion as to whether the government would be liable for negligence in this instance.

The Supreme Court of Iowa adopted Section 402A of the Restatement (Second) of Torts as its formulation of strict products liability law in the case of *Hawkeye Security Insurance v. Ford Motor Co.*, 174 N.W.2d 672 (Iowa 1970) and reaffirmed in *Osborn v. Massey-Ferguson, Inc.*, 290 N.W.2d 893, 901 (Iowa 1980). The essen-

tial elements to establish a cause of action under the strict liability under Iowa law are (1) manufacture of a product by a defendant; (2) the product was in a defective condition; (3) the defective condition was unreasonably dangerous to the user or consumer when used in a reasonably foreseeable use; (4) the manufacturer was engaged in the business of manufacturing such a product; (5) said product was expected to and did reach the user or consumer without substantial change in condition, i.e., the defect existed at the time of the sale; (6) said defect was the proximate cause of personal injuries or property damage suffered by the user or consumer, and (7) damages suffered by the user or consumer. *Osborn v. Massey-Ferguson, Inc.*, 290 N.W.2d 893, 901 (Iowa 1980); *Petty v. United States*, 592 F.Supp. at 691; *Holmquist v. Volkswagen of America, Inc.*, 261 N.W.2d 516, 520 (Iowa 1977). The disputed issues in this case relate to elements (2), (3), (6), and (7).[8]

Under Section 402A of the Restatement (Second) of Torts, a product may be unreasonably dangerous if the seller fails to give adequate warnings as to its use. *See* Comment j to Section 402A, Restatement (second) of Torts. The Iowa Supreme Court so held in *LaCoste v. Ford Motor Co.*, 322 N.W.2d 898 (Iowa 1982); *Cooley v. Quick Supply Co.*, 221 N.W.2d 763 (Iowa 1974). In *LaCoste* the Court stated:

> [I]t is also recognized that in the application of the doctrine of strict liability in tort, as embraced by section 402A, Restatement (Second) of Torts (1965), a product, although faultlessly made, may nevertheless be deemed defective so as to subject the manufacturer to strict liability if it is unreasonably dangerous to place the product in the hands of a user without a suitable warning. *See Cooley v. Quick Supply Co.*, 221 N.W.2d 763, 768–69 (Iowa 1974).

---

**8.** The policy behind § 402A is best summarized in comment c to § 402A: "[P]ublic policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be

treated as a cost of production against which liability insurance can be obtained ..."

Ruling had been reserved as to Exhibits A, S, S–1 and T. They were admitted and considered by the Court.

*Id.* at 900. In *Cooley,* the Iowa Supreme Court stated:

> Where an act involves: A risk of death or serious bodily harm, and particularly if it is capable of causing such results to a number of persons, the highest attention and caution are required even if the act has a very considerable utility. Thus, *those who deal with … poisonous drugs … are required to exercise the closest attention and the most careful precautions,* not only in preparing for their use but in using them. (Emphasis supplied).

*Cooley v. Quick Supply Co.,* 221 N.W.2d at 769.

An action for strict liability in tort focuses on whether the product, as marketed, is defective. The fact that a risk of harm was unforeseeable is irrelevant to a program participant's liability for failure to warn under a strict liability under Iowa law. *Petty v. United States,* 740 F.2d 1428, 1440 (8th Cir.1984). Those who deal with such products as poisonous drugs must take the most careful precautions. *Cooley v. Quick Supply Co., Supra.* In focusing on the risk of a product under strict products liability the courts have imputed knowledge of the risk to the manufacturer. *See, e.g. Phillips v. Kimwood Machine Co.,* 269 Or. 485, 492, 525 P.2d 1033, 1036 (1974). "The relevant question is then whether the product 'is so harmful to persons or property that a reasonable prudent manufacturer would not have placed it on the market'. *Robbins v. Farmers Union Grain Terminal Ass'n,* 552 F.2d 788, 795 n. 15 (8th Cir.1977) (quoting *Phillips v. Kimwood Machine Co.,* 525 P.2d at 104–41 n. 16), *see also Aller,* 268 N.W.2d at 836 (equating *Phillips'* test, with its emphasis on the seller, with the consumer expectations test applied in Iowa)." *Petty v. United States,* 740 F.2d 1428, 1441.

In *Petty* [9] this trial court found the printed warnings given for the swine flu vaccination to be inadequate to warn of the dangers of serum sickness. In *Petty,* on appeal the Eighth Circuit stated, "[W]e determine the drug manufacturer's liability under strict liability, by assuming knowledge of the risk of serum sickness." *Petty, supra,* 740 F.2d 1428, 1441. Similarly, in this case in determining the drug manufacturer's liability under strict liability, the Court must assume the drug manufacturer had knowledge of the risk of contracting myalgia for extended periods of time after receiving the swine flu vaccination. The warning was inadequate to give notice of risks of which the manufacturer was deemed to have knowledge. Further, the vaccine was unreasonably dangerous to Darlene Brazzell due to its lack of an adequate warning of the risks associated with the use of the drug. As the Court of Appeals stated in *Petty,* "The alleged warning here did more to dilute the seriousness of the risks at stake than it did to apprise the recipients of the existence of those risks. Indeed, it appears that assuring participation was the motivation behind the phraseology decisions rather than an effort to inform the recipients of the risks." *Petty v. United States,* 740 F.2d at 1437.

The government argues that this case is distinguishable from *Petty* because the vaccination was administered at a doctor's office, and not in a mass-immunization clinic as in *Petty.* Thus, the government argues that the manufacturer's duty to warn flows only to the doctor because of the existence of a "learned intermediary". The government contends that no issue has been raised about the adequacy of the warning provided plaintiff's doctor, therefore plaintiff cannot recover.

The warning provided plaintiff's doctor for use with administering the vaccination was the same warning provided to Petty at the mass-immunization clinic. (Def't Exh. E and F). Darlene Brazzel was required to sign the same consent form at the doctor's office as Petty was required to sign at the mass-immunization clinic. No additional warning was provided plaintiff outside of

**9.** There are four *Petty* cases. This citation is

from 536 F.Supp. 860, at 870.

the warning on those forms signed by plaintiff at her doctor's office. The fact there was a learned intermediary here is not a significant distinction because the doctor neither had nor passed along any additional warning as to the risks of the vaccine from which plaintiff could have made an intelligent informed consent. There was no unanimity in the medical community that Dr. Spellman could rely upon. Dr. Jonas Salk, of vaccine fame, testified concerning additional disclosures that should have been made that were not on the "consent" forms. (Salk Deposition, p. 97). Dr. Spellman, the learned intermediary here, is an excellent physician with a fine reputation. The Court finds that what he knew prior to the shot being given to the plaintiff was properly relayed to the plaintiff. The record clearly shows that he, too, had need of additional accurate information. He stated, "If there was any error it was probably in what you might say jumping the gun, because the epidemiologist probably had come to the wrong conclusion too rapidly—, they probably should have stepped back for just a little bit before advising the mass immunization." (Tr. 23). He further stated, "I told her all I knew about it." (Tr. 25). He further stated, "She got myalgia after the vaccination—the difference was it continued longer [than the warning predicted]." Thus, plaintiff has met elements (3) and (4) above for establishing strict liability.

In order to recover, plaintiff must show that her injuries were proximately caused by the swine flu vaccination. Proximate cause exists when it is shown that (1) the vaccination, in fact, caused plaintiff's myalgia and emotional problems, (2) had plaintiff had been warned appropriately, she would have foregone the shot. *Petty v. United States*, 740 F.2d at 1437.

With reference to the first element of proximate cause, defendant contends that plaintiff's doctors relied merely on a temporal relationship between plaintiff's myalgia and vaccination in determining that plaintiff's problems were caused by the swine flu vaccination, and that a reliance on a temporal relationship is insufficient to trigger liability.

The Court finds defendant's contention that plaintiff's doctors relied merely on a temporal or time relationship to be without merit. Dr. Spellman testified that based upon his experience as a medical doctor specializing in internal medicine, and his examination and treatment that to a reasonable medical certainty, plaintiff's illness was caused by a reaction to the swine flu vaccination. (Dr. Spellman pp. 8–9) His conclusion was not based on the temporal relationship alone. Dr. Brooks, her treating psychiatrist testified that the physical stress, caused by the pain she experienced, contributed to plaintiff's emotional problems. (Dr. Brooks p. 6) It appears that plaintiff was undergoing some stress in her home life at the time she experienced her emotional problems and that this situation also contributed to her emotional problems. Speculative proof is insufficient. *Larkin v. Bierman*, 213 N.W.2d 487, 488 (Iowa 1973). However, here the proof showed, to a reasonable medical certainty, that her myalgia and aggravated emotional problems were proximately caused by the vaccination. The Court finds that plaintiff has shown that the vaccine was the cause of her myalgia and her aggravated emotional problems.

The government next contends that the lack of an adequate warning was not the proximate cause of plaintiff's problems because plaintiff never testified she would not have taken the vaccination if advised of the possible risks.

In *Petty* this Court determined that the Iowa Supreme Court would have presumed that Mr. Petty would have read an adequate warning and then he would have acted on it. *Petty v. United States*, 592 F.Supp. at 691; *aff'd* 740 F.2d 1428, 1438, *citing Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir.1974). This was a departure from traditional proximate cause formulation under Iowa law. *See Perin v. Hayne*, 210 N.W.2d 609 (Iowa 1973). Of some significance to the Court's determination that Iowa would follow this rebuttable

presumption formulation in the *Petty* case was the fact that Mr. Petty received the vaccination without the benefit of a physician-patient relationship. The Court stated, "However, the *most notable distinction* between this case and the *Perin* case is that the *'hardsell'* approach to immunization taken here had the natural effect of firmly planting within the recipient's mind the imperative need for receiving the shot." *Petty v. United States*, 592 F.Supp. at 691. The Court concluded that this hardsell approach had the "distinct effect of de-emphasizing the importance of making individual determinations as to the advisability of undergoing the risks of immunization." *Id.* This Court now holds that this includes persons who conferred with a physician but received no additional information about the vaccine with which to make an intelligent informed consent.

Darlene Brazzell, like Petty, was subjected to the publicity surrounding the vaccination program. As previously mentioned, she saw President Ford receive the first shot on television, and read several magazine and newspaper articles advising everybody to get the swine flu shots. (T. 78). The hardsell approach was particularly regrettable in this case because of the failure to advise Mrs. Brazzell that 90% of the persons in her age group already had more immunity to the influenza than the vaccine could provide (Plaintiff's Exh. 76, p. 60). Given the government's hardsell approach to the vaccination program and a consent form which de-emphasized the risks involved in receiving the vaccine (see e.g. Exh. 50), the Court believes that Iowa would apply the rebuttable presumption formulation applied in *Petty* and *Reyes* to the instant case.

Under the Iowa "patient rule" standard for obtaining informed consent, a physician has a duty to disclose all information that would be material to the plaintiff's decision to consent to a proposed treatment. *Cowman v. Hornaday*, 329 N.W.2d 422, 427 (Iowa 1983). Materiality is defined as the significance a reasonable person, in what the physician knows or should know is his patient's position, would attach to the risk in deciding whether to submit to a proposed treatment. *Id.; Wilkinson v. Vesey*, 110 R.I. 606, 626, 295 A.2d 676 (1972). Plaintiff's physician could disclose nothing more than was on the consent forms, and this warning was too vague to spark the concern which would engender questions about the proposed treatment. *Petty v. United States, supra*, 740 F.2d, at 1437.

The government has failed to cite any evidence in the record to the effect that an adequate warning would not have been followed. The government argues simply, that plaintiff must show that a lack of an adequate warning was the proximate cause of her problems. As in *Petty*, the Court rejects this approach.

Iowa Code § 147.137 provides that a consent in writing shall create a presumption that informed consent was given if it, among other things, "sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadruplegia, paraplegia, the loss or loss of function of any organ or limb, ... with the probability of each such risk if reasonably determinable." While *Cowman* did not cite this statute, the approach taken by the Iowa Supreme Court in *Cowman* was consistent with this section. Only a very general warning was given here. It did not set forth specifics such as are required by § 147.137. The Court finds that Iowa Code § 147.137 was not complied with here, and thus, no presumption of informed consent arises. *See Petty v. United States, supra*, 592 F.Supp. at 690. The plaintiff argues that because Iowa Code § 147.137 was not complied with, this amounted to negligence per se. Because the plaintiff may be granted complete relief under strict liability, the Court need not address the issue of whether noncompliance with Iowa Code § 147.137 is negligence per se for which this defendant may be held liable.

Both the drug company which manufactured the product and the doctor who administered the drug were *program participants*. The United States stands in the shoes of the program participants and is liable for their omission to cause plaintiff

to receive an adequate warning. *Petty v. United States, supra,* 592 F.Supp., at 693; 740 F.2d, at 1438–39.

### III. Damages

■ The medical and drug expenses incurred by Darlene Brazzell totaled $8,785.07, less payments made by medicare in the sum of $5,302.12, leaving a balance of $3,482.95.[10] The plaintiff had not been working prior to the lawsuit and no claim for lost wages has been made and none will be awarded.

Within a few hours of taking the swine flu shot, the plaintiff felt hot, faint and lightheaded with a "terrible" feeling of tenseness. These complaints became steadily worse; she ached all over and had numbness in her left arm; nothing helped her and ten days later she went into the hospital. She spent a total of 60 days in the hospital over four different admissions, the longest being 29 days. She was never free of pain in the first 15 days and was still experiencing pain and medical problems until August 8, 1978 (Spellman Tr., p. 17) and was still under the psychiatrist's care at the time of trial.

Her son, Thomas Brazzell, a teacher, testified that his mother, the plaintiff, had been alert, busy and active prior to receiving the swine flu shot; that since that time he has seen her self assurance, memory, and alertness all diminish and that she had had constant physical problems, necessitating that she drastically reduce all activities. Her husband supported this testimony and points out that she had certain emotional problems which were aggravated.

The plaintiff was 65 years old at the time of trial and her life expectancy was 17.32 years. The plaintiff's past pain and suffering were real. Fortunately for the plaintiff, she has experienced less trouble in recent years.

■ Accordingly, the Court finds that the plaintiff should recover general damages in the amount of $30,000.00, including interest, for both her physical and mental pain and suffering from the onset of her illness to the date of completion of the trial, which was approximately seven years.[11]

The Court does not believe that the evidence supports a finding of permanent injuries and future pain and suffering and concludes that the plaintiff has not met her burden of proof on these issues.

In summary, the plaintiff is entitled to an award of $3,482.95 for special damages and $30,000.00 for past pain and suffering, which sum includes any interest to date of judgment.

For all of the foregoing reasons,

IT IS THEREFORE HEREBY ORDERED that judgment be entered for the plaintiff in the amount of $33,482.95 with postjudgment interest and costs of this action as provided by law.

---

**10.** This included 60 days in the hospital at $6,156.40 (Exh. 87), 80% of which was paid by medicare, leaving a balance of $1,232.28; drugs in the sum of $1,000.04 (Exh. 86); Dr. Spellman, internist, $725.77 (Exh. 89) of which $378.00 was paid by medicare, leaving a balance of $347.77; Dr. Brooks, psychiatrist, $902.50 (Exh. 88).

**11.** This cause was delayed for many months because *Petty v. United States* went up to the Eighth Circuit on two occasions and this Court did not want to rule on her case until *Petty* was reconciled.